832 F.2d 811
 53 Fair Empl.Prac.Cas. 703,
45 Empl. Prac. Dec. P 37,737
 VULCAN PIONEERS, INC., William Thomas, Joseph Head, Charles
Lige, Ernest Smith, Benjamin Josephs, Ronald Heath
v.
The NEW JERSEY DEPARTMENT OF CIVIL SERVICE, Ralph P. Shaw,
Chief Examiner of the Department of Civil Service,
et al., Plaintiffs-Intervenors.
UNITED STATES of America
v.
STATE OF NEW JERSEY, et al.
v.
Robert M. SHERIDAN, et al., Intervenors.
UNITED STATES of America
v.
STATE OF NEW JERSEY, et al., Intervenors.
UNITED STATES of America and James W. Stewart, Intervenor,
v.
STATE OF NEW JERSEY, et al., Intervenors.
UNITED STATES of America
v.
STATE OF NEW JERSEY, et al., Intervenors.
UNITED STATES of America
v.
STATE OF NEW JERSEY, et al.
v.
HOBOKEN FIRE OFFICERS ASSOCIATION LOCAL 1076, I.A.F.F.,
AFL-CIO, Intervenor.
Appeal of STATE OF NEW JERSEY, in No. 86-5928.
Appeal of the HOBOKEN FIRE OFFICERS ASSOCIATION, LOCAL 1076,
I.A.F.F., AFL-CIO, Intervenor in No. 86-5929.
 
 Nos. 86-5928, 86-5929.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 7, 1987.
Decided Nov. 10, 1987.
 W. Carey Edwards, Atty. Gen. of New Jersey, Eugene J. Sullivan (argued), James J. Ciancia, Asst. Attys. Gen., Mark J. Fleming, Deputy Atty. Gen., Trenton, N.J., for appellant State of N.J.
 Stephen J. Edelstein, Charles Naselsky (argued), Laura Bertollo, Donald M. Onorato, Schwartz, Pisano, Simon & Edelstein, Livingston, N.J., for appellants Hoboken Fire Officers Ass'n, Local 1076.
 Wm. Bradford Reynolds, Asst. Atty. Gen., Marie K. McElderry (argued), David K. Flynn, Jessica Dunsay Silver, Miriam R. Eisenstein, U.S. Dept. of Justice, Appellate Section, Civil Rights Div., Washington, D.C., for appellees.
 John H. Watson, Jr., Corp. Counsel, East Orange, N.J., for City of East Orange.
 Anthony D. Rinaldo, Jr., Rinaldo & Rinaldo, Elizabeth, N.J., for intervenor New Jersey State Firemen's Mut. Benevolent Ass'n.
 Before SEITZ, MANSMANN and GREENBERG, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 The State of New Jersey appeals the judgment of the district court invalidating the State Civil Service test for promotions to the rank of fire captain[1] for fire departments and the subsequent order of the court that the eligibility lists based on the results of this test could not be used for any purpose. The Hoboken Fire Association, Local 1076 (Local 1076) appeals the district court's rejection of its proposed plan for interim relief. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291 (1982).
 
 I.
 
 2
 At issue in this case is whether the test administered by the New Jersey Department of Civil Service (Department) to rank candidates for promotions to the position of fire captain in twelve New Jersey cities satisfies the requirements of the consent decree entered into by the various parties to this litigation.
 
 
 3
 On October 4, 1977, the United States filed suit against the State of New Jersey, an official of the New Jersey State Civil Service Commission, and twelve municipalities alleging that the defendants were engaging in a pattern or practice of discrimination on the basis of race and national origin with respect to hiring and promotion in the fire departments of the respective municipalities.[2] The parties entered into a consent decree on May 30, 1980, which was approved by the district court. This decree did not contain a finding of discrimination but did obligate the State defendants "to undertake affirmative action to increase substantially the proportion of black and Hispanic personnel on their respective fire departments" and to "review the composition of the current selection process for appointments to ranks above the level of firefighter to ensure job relatedness and with the goal of eliminating adverse impact on black and Hispanic applicants in accordance with Title VII of the Civil Rights Act of 1964, as amended, and the Guidelines issued thereunder." Under the decree, the State defendants were required to conduct job analyses of all promotional classifications "in a manner consistent with the Uniform Guidelines of Employee Selection Procedures, 28 C.F.R. 50.14, and other professionally accepted standards...." The United States was granted the right to object to any selection process it found to have the purpose or effect of discrimination against minority applicants and, if necessary, to move for resolution in the district court.
 
 
 4
 Pursuant to the decree, the Department conducted job analyses of the fire captain position. A written, multiple-choice examination based on these analyses was developed. On seven occasions from June 1981 through June 1984, the State administered this test for the defendant municipalities to firefighters who satisfied the eligibility requirement of three years of service. Applicants who scored above the minimum cut-off were ranked on the eligibility list according to their final average score, which was calculated based on their score on the written test (80%) and on their seniority and service record (20%). When a municipality requested candidates for promotion, the state certified the number of individuals equal to the number of vacancies plus two, in rank order based on the final average scores. The municipality could promote any of the certified candidates, with certain exceptions not at issue here.
 
 
 5
 In March 1983, the United States raised objections to the test, alleging that the results exhibited adverse impact under the four-fifths rule of the Uniform Guidelines.[3] In May 1984, after informal efforts to resolve its objections had failed, the United States filed a motion seeking an order from the district court enforcing the consent decree by enjoining the use of promotional lists generated by these tests and by requiring the use in the future of a test that is job related or that has no adverse impact. After trial, the court entered a judgment for the United States and urged the parties to reach an agreement concerning a manner for utilizing the existing lists pending the development of new lists generated from a valid test. Vulcan Pioneers, Inc. v. New Jersey Dep't of Civil Serv., 625 F.Supp. 527 (D.N.J.1985).
 
 
 6
 The parties, however, were unable to agree on an interim course of action, and various proposals were submitted to the district court. After a hearing, the court rejected all the proposals and instead enjoined the use of the existing promotional lists and ordered each municipality to continue rotating acting captains in lieu of making either provisional or permanent appointments. United States v. State of New Jersey, 658 F.Supp. 9 (D.N.J.1986).
 
 
 7
 These appeals followed.
 
 II.
 
 8
 This action involves a motion by the United States for the enforcement of a consent decree. While a consent decree "must further the objectives of the law upon which the complaint was based, ... the parties' consent animates the legal force of a consent decree." Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland, --- U.S. ----, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986) (citations omitted). Thus, we must examine the language of the consent decree to determine the obligations and duties undertaken by the various parties.
 
 
 9
 In the consent decree, the State defendants committed themselves to ensuring that the selection process for promotions would be job related, in accordance with both Title VII and the Uniform Guidelines. Our review must, therefore, begin by evaluating the district court's finding of fact that the selection process implemented by the State was not job related as defined by the Uniform Guidelines.[4] All the parties agree that our review of the district court's findings is governed the "clearly erroneous" standard. We will reverse findings of fact by the district court only if they are found to be clearly erroneous. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We now address the State's contention that the district court's finding that the promotional test in question was not job related is clearly erroneous.
 
 
 10
 The Supreme Court has stated that a test is job related if it is "shown, by professionally acceptable methods, to be 'predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.' " Albemarle Paper Co. v. Moody, 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975) (quoting the Equal Employment Opportunity Commission's Guidelines on Employee Selection Procedures, 29 C.F.R. Sec. 1607.4(c) (1974)). Under the Uniform Guidelines, a test may be valid if it is based on criterion-related validity studies, content validity studies, or construct validity studies. 28 C.F.R. Sec. 50.14(5)(A). The State attempts to justify its test solely as being content valid. To satisfy the content validity standard, evidence must be presented showing that "the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated." Id. Sec. 50.14(5)(B). The Technical Standards of the Uniform Guidelines establish requirements for proving content validity. Specifically, the study performed should:
 
 
 11
 [include] an analysis of the important work behavior(s) required for successful performance and their relative importance and, if the behavior results in work product(s), an analysis of the work product(s). Any job analysis should focus on the work behavior(s) and the tasks associated with them. If work behavior(s) are not observable, the job analysis should identify and analyze those aspects of the behavior(s) that can be observed and the observed work products. The work behavior(s) selected for measurement should be critical work behavior(s) and/or important work behavior(s) constituting most of the job.
 
 
 12
 Id. Sec. 50.14(14)(C)(2).
 
 
 13
 The promotional test at issue in this case is based upon job analyses performed by New Jersey's fire examiner in 1981. To obtain accurate descriptions of the duties and functions of and requirements for the fire captain position, subject matter experts (SMEs) from eleven of the twelve municipalities attended two separate sessions. At the first session, the SMEs developed task statements describing the activities performed by fire captains and rated the time spent on each task and the criticality (consequence of error) of each. The SMEs delineated the knowledges, abilities, and skills (KASOs) required for a fire captain to perform these tasks, rated the KASOs in terms of importance, and indicated whether each was appropriate for qualifying and ranking candidates.
 
 
 14
 For the second session, the fire examiner developed the standard task statements and KASOs, but the basic procedures were similar to those previously followed. Based on the results of these two sessions, the fire examiner summarized by city the information obtained. Using the aggregate data, the fire examiner determined the number of questions concerning each KASO that would be included on the state-administered examination (the composition of the test was the same for each city regardless of any differences expressed by a particular city's SMEs regarding any aspect of the KASOs) based on a formula that incorporated several factors. For a variety of reasons, however, some KASOs were not tested. Using textbooks recommended by the SMEs, the fire examiner then wrote test questions, often paraphrasing the wording of specific texts.
 
 
 15
 In 1984, the State hired an independent consultant to determine the validity of the tests being challenged by the United States. He reviewed the work performed during the initial job analyses and several studies of firefighters conducted for other governmental agencies; he also conducted his own study of the abilities necessary to perform as a fire captain and whether these abilities were in fact tested by the challenged examination. The State's expert concluded that the state-administered tests satisfied the requirements of content validity established in the Uniform Guidelines.
 
 
 16
 After weighing the evidence presented at trial, the district court concluded that the job analyses performed by the State fire examiner in 1981 did not satisfy the requirements set forth in the Uniform Guidelines or other professional standards. In reaching this conclusion, the district court made detailed findings regarding shortcomings in the job analyses that were performed. Among the district court's findings were that the task statements were too general, thus precluding an evaluation of their relative importance and criticality; that the KASO statements were also too general and failed to consider the degree of proficiency that a fire captain must demonstrate; that the validity of certain KASOs was doubtful because of the large discrepancies in importance assigned these KASOs by the SMEs from various cities (and the fact that these discrepancies were neither investigated nor explained); and that many important aspects of a fire captain's duties and activities were omitted from the task statements. The district court also found important flaws in the test itself, including that the test rewarded test-taking ability rather than the knowledges, abilities, and skills necessary for the position; that the test focused on a candidate's ability to recall data from particular texts rather than his knowledge or abilities; that test questions were ambiguously phrased; and that questions tested knowledge of terminology rather than of the underlying concepts. Furthermore, the court determined that the tests in question were not appropriate for ranking candidates.
 
 
 17
 The district court also found that the analysis performed by the State's expert in 1984 failed to establish the validity of the tests. The court cited five shortcomings in the methodology employed in support of its conclusion that the procedures utilized were flawed.
 
 
 18
 In arguing that the district court's findings are clearly erroneous, the State does not present evidence that particular findings are clearly erroneous; rather its argument centers on the contention that the court should have assigned more weight to the testimony of the State's expert and less to that of the expert of the United States. In making its findings, the district court expressly discounted the testimony of the State's expert whereas it directly credited testimony of the expert who testified on behalf of the United States. Weighing the credibility of the testimony presented at trial and of the witnesses themselves is the province of the trier of fact. This court will not overturn such findings except in exceptional circumstances. Nothing brought to the attention of this court nearly rises to that level.
 
 
 19
 For these reasons, we conclude that the findings of the district court are not clearly erroneous and that the district court was correct in entering a judgment in favor of the United States on its motion to enforce the consent decree.
 
 III.
 
 20
 We next address (1) the State's contention that the district court erred in enjoining the affected municipalities from making either provisional or permanent appointments to the position of fire captain based on the eligibility lists produced from the invalidated exam and (2) Local 1076's argument that the court committed reversible error by refusing to adopt its proposed plan. Our standard of review is abuse of discretion.
 
 
 21
 In fashioning interim relief, the district court sought to satisfy three goals: (1) to eliminate discriminatory effects; (2) not to bestow any advantage or impose any disadvantage on any individual before a new, valid test is administered; and (3) to insure the safety of citizens and their property in the affected cities. The court first considered and rejected various proposals that had been submitted to it, each of which had met with objections from at least one other party. The court concluded that enjoining the use of the existing lists for the purpose of making appointments and ordering the municipalities to continue to rotate acting fire captains was the most appropriate means for satisfying these objectives.
 
 
 22
 The State contends that proposals that permit the making of some permanent appointments from existing lists while preserving at least an equal number of vacancies to be filled from the lists based on the administration of a new test and that are coupled with "make whole" relief (i.e., full back pay and seniority for minority candidates who pass the new exam) are a reasonable accommodation of the conflicting interests. Similarly, Local 1076 contends that the district court erred in not adopting its plan for the City of Hoboken whereby the top twelve candidates on the existing eligibility list would be permanently appointed as fire captains and the only minority candidate eligible to take the previous test would be promoted to fire captain and would receive full back pay and seniority were he to score above the cut-off level on the valid test. The district court noted that such programs would grant non-minority candidates the benefits flowing from an invalid exam while imposing solely on minority applicants the obligation of taking the new exam. The court specifically refused to "place the remedial burden, almost exclusively, on the minority group." United States v. New Jersey, 658 F.Supp. at 13. This argument strongly supports the relief granted by the district court.
 
 
 23
 The State and Local 1076 further argue that the interim relief ordered by the district court punishes and is unfair to those candidates who, by virtue of their high ranking on the eligibility lists, expected promotions. Candidates who scored well on an invalid exam do not have an "absolute right" to or even a "legitimate firmly rooted expectation" of the promotion. See Johnson v. Transportation Agency, U.S. ----, 107 S.Ct. 1442, 1455, 94 L.Ed.2d 615 (1987). Furthermore, candidates not promoted still retain their jobs and remain eligible to compete for these very same promotions when the new examination is administered. Any burdens placed on these candidates simply do not rise to an impermissible level.[5]
 
 
 24
 Given the reasoning advanced by the district court in support of the interim relief that it ordered[6] and the failure of appellants to prove that any legal deficiencies exist in the relief granted or that a legal right is being denied to the non-minority candidates, we conclude that the relief ordered by the district court did not constitute an abuse of discretion.
 
 IV.
 
 25
 In light of the foregoing, the orders of the district court will be affirmed.
 
 
 
 [1]
 Although municipalities refer to the first-level supervisory ranks for firefighters as either fire lieutenant or fire captain, the state has determined that the positions are equivalent. The same selection procedure was used during the period 1981-1984 in making promotions to both positions, with only one minor exception. We shall refer to both positions as fire captain
 
 
 [2]
 This case was originally consolidated with a private class action, but the district court dismissed certain individual plaintiffs who had failed to file complaints with the EEOC in a timely manner and who had failed to allege intentional discrimination. Vulcan Pioneers, Inc. v. New Jersey Dep't of Civil Serv., No. 950-73 (D.N.J. Feb. 23, 1979), aff'd sub nom. Hood v. New Jersey Dep't of Civil Serv., 680 F.2d 955 (3rd Cir.1982)
 
 
 [3]
 "A selection rate for any race, sex, or ethnic group which is less than four-fifths ( 4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact." 28 C.F.R. Sec. 50.14(4)(D)
 
 
 [4]
 Because the State defendants are obligated under the specific language of the consent decree to develop a selection procedure that is job related, we need not address the issue of whether the United States presented sufficient evidence to prove a prima facie case that the test in question had an adverse impact on minority candidates, which is the preliminary hurdle that must be passed in actions alleging violations of either Title VII or the equal protection clause
 
 
 [5]
 We find Local 1076's contention that the relief granted constitutes a race-conscious remedy to be totally at odds with the facts of the case. We therefore find it inappropriate to apply strict scrutiny in evaluating the relief granted by the district court
 
 
 [6]
 Furthermore, the district court did not totally preclude the possibility of alternative interim relief. The court exhibited the necessary flexibility when it specifically stated its willingness to consider any new proposals for interim relief that are submitted after having obtained the consent of the parties