Thomas **FREEMAN**, Jr., Michael E. Jordan, Rodney Ladson, individually and on behalf of all others similarly situated, and the Guardian Civic League, Inc.

v.

**CITY OF PHILADELPHIA**, Orville W. Jones, in his official capacity as the duly appointed Personnel Director for the City of Philadelphia, Fraternal Order of Police, Lodge No. 5, and Joseph Campana.

Civ. A. No. 90–2356.

United States District Court,
E.D. Pennsylvania.

Oct. 16, 1990.

Michael Churchill, Public Interest Law Center of Philadelphia, Philadelphia, Pa., for plaintiffs.

Frank Finch, III, Ralph J. Teti, Susan Shinkman, Chief Deputys, Sp. Litigation, Law Dept., City of Philadelphia, Philadelphia, Pa., for defendants.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

The individual plaintiffs, along with defendants City of Philadelphia and its Personnel Director (City defendants), seek ju-

dicial approval of a proposed Consent Order designed to settle this action, which assails as racially discriminatory the City's written examination for police officer recruits. The Court convened a hearing on September 12, 1990 to consider whether the settlement is fair, adequate, and reasonable. For the reasons that follow, the Court will approve the proffered Consent Order.

### I.

To obtain the Philadelphia civil service position of police officer recruit, a person must satisfy various requisites. An applicant must be between eighteen and thirty-six years old, be a high school graduate or equivalent, and have been a Philadelphia resident for at least one year. A written pre-employment examination, periodically administered, serves as the initial screening device. The City establishes an eligibility list, which, based on raw exam scores, arranges candidates in numerical order from the highest passing score to the lowest passing score. Only those who are certified on this rank-order list and who obtained a sufficiently high ranking in light of the number of positions open receive further consideration. Medical and psychiatric evaluations, drug tests, polygraph examinations, and background investigations follow. Applicants who navigate all these requirements then enter a graded nineteen-week training program at the Police Academy. After graduation from the Academy and upon the expiration of an on-the-job probationary period, police recruits become officers. At this time, approximately twenty-two percent of all police officers are black.

For a full understanding of the context of this litigation, one must look to two prior suits in which minority groups challenged the hiring, screening, and promotion procedures utilized by the Philadelphia Police Department. In 1970, classes of black plaintiffs instituted a broad-based attack on the Police Department's employment practices. Some two years after the suit was initiated and after extensive hearings, the district court held that the then-used entrance examination had a disparate impact upon blacks and was not validated as job-related. *Commonwealth of Pennsylvania v. O'Neill*, 348 F.Supp. 1084 (E.D.Pa.1972), *aff'd in part*, 473 F.2d 1029 (3d Cir.1973). In consequence, the City sought the assistance of Educational Testing Service (ETS) to create and validate a new written exam. Several more rounds of litigation, focusing on other dimensions of the hiring and promotion process, ensued. Fourteen years after the action was brought, the parties finally submitted, and the court approved, a consent decree. The consent decree committed the defendants to continue retention of ETS (or a similar organization) for purposes of developing a non-discriminatory examination. 100 F.R.D. 354, 362 (E.D.Pa. 1983), *aff'd mem.*, 746 F.2d 1465 & 1466 (3d Cir.1984). It also provided that the City, in order to correct the disparate effects of the entrance test, would hire a specified number of black applicants, in addition to those selected in rank order. *Id.* at 357.

Beginning in 1977, classes of Hispanic applicants charged that the City's written exam, prepared with the help of ETS and administered in 1975 and 1978, contravened federal and state law because it discriminated against them. *Alvarez v. City of Philadelphia* 98 F.R.D. 286, 288 (E.D.Pa. 1983). The *Alvarez* court heard considerable expert testimony about the ability of the tests to predict future performance, but, before the court rendered a decision, the parties entered into a consent decree, which was approved on May 21, 1984. The order bound the City to hire a certain number of Hispanic officers and to expend its best efforts to utilize a non-discriminatory examination.

The plaintiffs in this case assert that Philadelphia's current written examination for the position of police officer recruit unlawfully discriminates against blacks in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-1 *et seq.*, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. In their complaint, they sought, among other forms of relief, a permanent injunction barring use of the ostensibly illegal test. The

Court permitted the Fraternal Order of Police (FOP) and Joseph Campana to intervene as party-defendants.

The plaintiffs and the City subsequently filed a joint motion for class action certification. By Order dated July 17, 1990, the Court certified two plaintiff classes. The first class, represented by Thomas Freeman, Jr. and Rodney Ladson, encompasses all Afro–American applicants for the police officer recruit position who had failed the written examination given on December 16, 1989 or June 23, 1990. The second group of plaintiffs, represented by Michael E. Jordan, includes all Afro–American applicants for police officer recruit who received passing scores on the December or June test, but who, because of the City's utilization of a rank-order eligibility list were not selected for appointment to the first classes of police officer recruits.

At the same time, because the plaintiffs and the City defendants had submitted a proposed Consent Order, the Court approved a notice of hearing on the proposed settlement pursuant to Federal Rule of Civil Procedure 23. The notice summarized the terms of the proffered Consent Order, stated that the Court had scheduled a hearing to consider its appropriateness, and allowed any individual "affected" by its terms to file written comments in support of or in opposition to the Consent Order. The notice was mailed to all identified persons who took the December 16th or June 23d examination and was published in three newspapers with large circulations in the Philadelphia area.

## II.

The proposed Consent Order forbids the City from certifying an eligibility list based on written exam scores if black applicants have a pass rate statistically significantly lower than the racial group having the highest pass rate or if the percentage of blacks in the top one thousand test-takers on the eligibility list is statistically signifi-

cantly less than the percentage of blacks who pass the test. The City may utilize such a list only if the Court finds after a hearing that the test and its scoring method validly predict future job performance or if the City appoints black applicants to the police recruit position at least at the same rate as the percentage of blacks who take the test. This latter stricture applies, however, only if the examination is, as now, given on a periodic basis. In the event the City adopts a process of continuous testing, the appointment rate of blacks to the police officer recruit position will be based on the percentage that black test-takers are of all test-takers during the preceding six months.

The Consent Order obliges the City to solicit and evaluate proposals for a new police officer recruit exam which minimizes adverse impact on nonwhites and which can be validated. For each test given, the City must conduct at least one session to assist prospective applicants in preparing for it. The Consent Order also contains several reporting requirements.

 At the hearing and by way of supplemental materials,[1] evidence was introduced in support of the settlement. The plaintiffs' theory of the case is that the written examination, though a facially neutral screening device, has a statistically significant and unjustifiable disparate impact on blacks. There is no doubt that Title VII reaches employment practices that are "fair in form, but discriminatory in operation," *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), even without proof of racial animus behind their use. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, ——, 109 S.Ct. 2115, 2118–19, 104 L.Ed.2d 733 (1989); *Washington v. Davis*, 426 U.S. 229, 246–47, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 (1976). Indeed, Congress, in promulgating the 1972 amendments to Title VII, specifically extended the Act to protect minorities against written examinations that create artificial barriers to job opportunities in

---

1. The Court made a request for further evidence during a telephone conference, in which all named litigants participated. At that time, the Court emphasized that copies of the additional exhibits should be sent to the FOP's counsel and that the FOP had the right to object to the introduction of the documents. The Court has not received any objections to date.

state and municipal governments. *Connecticut v. Teal*, 457 U.S. 440, 448–49, 102 S.Ct. 2525, 2531–32, 73 L.Ed.2d 130 (1982). An employer may continue to utilize a job criterion which has a detrimental effect on members of a particular racial group, however, if it is justified by business necessity, that is, if the criterion is " 'predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.' " *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975) (quoting EEOC Uniform Guidelines, 29 C.F.R. § 1607.4(C)). *Accord Croker v. Boeing Co.*, 662 F.2d 975, 991 (3d Cir.1981) (in banc). Even so, a plaintiff still may prevail if "he shows that the employer was using the [exclusionary] practice as a mere pretext for discrimination," *Teal*, 457 U.S. at 447, 102 S.Ct. at 2530, by demonstrating, for example, that other procedures, "without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.' " *Albemarle*, 422 U.S. at 425, 95 S.Ct. at 2375 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973)).

A City official testified that Philadelphia's Personnel Department, Test Development Division, creates the questions for police officer recruit entry examinations. An outside consultant then reviews the draft items and either blesses or revises them. ETS ceased this oversight function during 1987, apparently in response to a Justice Department probe and lawsuit which centered on the racially discriminatory effects of the ETS police hiring exam. *See United States v. Suffolk County*, 49 Empl.Prac.Dec. (CCH) ¶ 38,793, 1988 WL 69952 (E.D.N.Y.1988). A professor of psychology, who was retained after that time, assisted the City in formulating the December and June examinations at issue. Except for differences introduced for security reasons, the two exams are the same. The City has done disparate impact analyses of its present test, but has never properly validated it.

The parties stipulated to the relative pass-fail rates of blacks and whites who took the December and June tests. That information showed:

December 1989 Examination

| | Total no. of test-takers | Passed | Failed | % Failed |
|---|---|---|---|---|
| White | 1654 | 1552 | 102 | 6.2 |
| Black | 2120 | 1652 | 468 | 22.1 |

June 1990 Examination

| | Total no. of test-takers | Passed | Failed | % Failed |
|---|---|---|---|---|
| White | 626 | 601 | 25 | 4.0 |
| Black | 673 | 553 | 120 | 17.8 |

December and June Examinations Combined

| | Total no. of test-takers | Passed | Failed | % Failed |
|---|---|---|---|---|
| White | 2280 | 2153 | 127 | 5.6 |
| Black | 2793 | 2205 | 588 | 21.1 |

514

On the basis of this data, the plaintiff's expert testified that for the two exams, taken together or separately, the failure rate of black test-takers was statistically significantly higher than that of white test-takers and that the adverse impact was not likely to have occurred by chance. No one produced any evidence to contradict this conclusion.

The racial imbalance between the raw test scores of blacks and whites who passed the test is also apparent. The practical consequence of this is that fewer blacks are selected for further processing. For example, of the 200 individuals who obtained the highest raw scores on the December and June tests combined, 163 were white and only 23 were black, even though blacks constituted a majority of test-takers. The following tables show a similar pattern of racial disparity with respect to the scores of others who were successful on the test.

### December Examination Passers

| Raw Score | All Cases | No. White | No. Black |
|---|---|---|---|
| 99–100 | 142 | 112 | 19 |
| 96–98 | 540 | 351 | 153 |
| 93–95 | 574 | 307 | 224 |
| 90–92 | 513 | 245 | 227 |
| 87–89 | 455 | 184 | 229 |
| 84–86 | 391 | 120 | 240 |
| 81–83 | 363 | 105 | 216 |
| 78–80 | 280 | 76 | 173 |
| 75–77 | 249 | 50 | 171 |

### June Examination Passers

| Raw Score | All Cases | No. White | No. Black |
|---|---|---|---|
| 99–100 | 58 | 51 | 4 |
| 96–98 | 202 | 140 | 47 |
| 93–95 | 220 | 125 | 65 |
| 90–92 | 191 | 97 | 76 |
| 87–89 | 148 | 59 | 78 |
| 84–86 | 143 | 48 | 85 |
| 81–83 | 141 | 36 | 88 |
| 78–80 | 104 | 22 | 70 |
| 75–77 | 73 | 20 | 40 |

### December and June Examination Passers Combined

| Raw Score | All Cases | No. White | No. Black |
|---|---|---|---|
| 99–100 | 200 | 163 | 23 |
| 96–98 | 742 | 491 | 200 |
| 93–95 | 794 | 432 | 289 |
| 90–92 | 704 | 342 | 303 |
| 87–89 | 603 | 243 | 307 |
| 84–86 | 534 | 168 | 325 |
| 81–83 | 504 | 141 | 304 |
| 78–80 | 384 | 98 | 243 |
| 75–77 | 322 | 70 | 211 |

As noted earlier, the entrance test has never been validated. The plaintiffs submitted some anecdotal evidence that suggests the exam is not a satisfactory predictor or evaluator of work-related behaviors. Police Commissioner Willie Williams stated that when he had served as Inspector of the Department's Training Bureau in 1988 he discerned no correlation between the rank-order test performance of recruits and their academic success at the Academy. His conclusion is partially buttressed by the fact that the Academy has an overall failure rate of less than one percent. Additionally, Detective Ronald Oliver, a police veteran of twenty-one years and president of the Guardian Civic League, testified that, in his experience, written test scores do not appear to reflect on-the-job competence. Both witnesses expressed the view that the proffered Consent Order would not have a deleterious effect on the quality of the force.

### III.

### A.

The standard for approval of a proposed class action settlement is well established. The reviewing court must find that the submitted agreement is "fair, adequate, and reasonable," *Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d 956, 965 (3d Cir.1983), or, stated negatively, that its terms are "not unlawful, unreasonable, or inequitable." *United States v. City of Jackson*, 519 F.2d 1147, 1151 (5th Cir.1975). The Third Circuit has articulated several factors to guide this inquiry. These include the "complexity, expense and likely duration of the litigation," "the reaction of the class to the settlement," "the stage of the proceedings and the amount of discovery completed," the risks of establishing liability and securing relief, "the risks of maintaining the class action through the trial," the defendant's capacity to afford greater relief, and "the range of reasonableness of the settlement" to a possible recovery "in light of all the attendant risks of litigation." *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975) (quoting *City of De-*

*troit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974)); *see also Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3d Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974).

■ This standard possesses a special content, however, when a consent decree, offered to terminate Title VII litigation, includes race-conscious remedial provisions. Congress undoubtedly assigned a high premium on the voluntary settlement of Title VII disputes, regardless of whether an actual lawsuit has begun. *Johnson v. Transportation Agency*, 480 U.S. 616, 630, 107 S.Ct. 1442, 1451, 94 L.Ed.2d 615 (1987); *Firefighters v. Cleveland*, 478 U.S. 501, 515, 106 S.Ct. 3063, 3071, 92 L.Ed.2d 405 (1986); *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14,. 67 L.Ed.2d 59 (1981); *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974); 28 C.F.R. § 50.14(17). Thus, some courts have indicated, a presumption of validity attaches to proposed consent decrees in employment discrimination cases. *See, e.g., United States v. City of Alexandria*, 614 F.2d 1358, 1362 n. 10 (5th Cir.1980). On the other hand, when the consent decree does not merely memorialize a compromise between litigants, but, by virtue of its injunctive provisions, operates prospectively and implicates the interests of other individuals, the court must scrutinize the agreement "carefully" to ensure that it does not violate federal law or generate "unreasonable [or] proscribed" effects on third parties. *Williams v. City of New Orleans*, 729 F.2d 1554, 1559–60 (5th Cir. 1984) (in banc); *see also EEOC v. AT & T*, 556 F.2d 167, 174 (3d Cir.1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); *Patterson v. Newspaper & Mail Deliverers' Union*, 514 F.2d 767, 771 (2d Cir.1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976); *O'Neill*, 100 F.R.D. at 356. As a result, the Court, before approving the consent decree, must conclude "that the proposal represents a reasonable factual and legal determination based on the facts of

record, whether established by evidence, affidavit, or stipulation." *United States v. City of Miami,* 664 F.2d 435, 441 (5th Cir. 1981) (in banc) (plurality opinion)).

■ Phrased differently, the appropriate benchmark by which to evaluate the propriety of race-conscious measures contained in a consent decree is whether the employer could have implemented those measures on its own initiative, outside the context of litigation. *See Firefighters,* 478 U.S. at 512–13, 106 S.Ct. at 3070, *aff'g Vanguards v. Cleveland,* 753 F.2d 479, 483 (6th Cir. 1985). A public entity may, consistent with Title VII, voluntarily adopt an employment plan containing racial classifications if that program is designed to further a legitimate remedial purpose, such as the elimination of a "manifest racial imbalance," and if it implements that purpose by means which neither "unnecessarily trammel the interests" of other racial groups nor create "an absolute bar" to their employment opportunities. *Johnson,* 480 U.S. at 630, 107 S.Ct. at 1451 (quoting *Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979)).

■ The quantum and type of proof necessary to sustain a voluntary affirmative action program is different than that needed to authorize court-ordered remedies. The evidence of disparity offered to justify the remedial provisions of the agreement need not be "such to support a prima facie case against the employer" or even an "'arguable violation' on its part." *Johnson,* 480 U.S. at 630, 632, 107 S.Ct. at 1451, 1452. *Accord* Rutherglen & Ortiz, *Affirmative Action Under the Constitution and Title VII: From Confusion to Convergence,* 35 UCLA L.Rev. 467, 471, 503–18 (1988); Boyd, *Affirmative Action in Employment—The Weber Decision,* 66 Iowa L.Rev. 1, 10–12, 23–24 (1980). To impose a more stringent requirement for consent decree approval would collapse the "fundamental" distinction between volitional behavior by an employer and the exercise of coercion by the judiciary, *Johnson,* 480 U.S. at 631 n. 8, 107 S.Ct. at 1452 n. 8, and, more importantly, would derogate from Congress' "desire to preserve a relatively large domain for voluntary employer action." *Id.; see also id.* at 632–33 & n. 10, 107 S.Ct. 1452–53 & n. 10; *Firefighters,* 478 U.S. at 525–26, 106 S.Ct. at 3077; *Sheet Metal Workers v. EEOC,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986).

### B.

■ The proposed Consent Order survives scrutiny. First, the sum of the *Girsh* factors militate in favor of approval. Litigating this case to judgment would be, for both sides, a costly and time-consuming proposition. The parties would have to retain experts to evaluate statistical data and testify at trial. The City defendants would have to complete a validation study of its testing procedure. Not only would a validation study of its current exam entail great expense (of at least several hundred thousand dollars, according to one Philadelphia official), but it might very well ultimately confirm the plaintiffs' evidence that use of the test is not justified by business necessity. Anyone who doubts that these undertakings would result in protracted rounds of discovery, procedural skirmishes, and hearings need look no further than the massive records compiled in *O'Neill* and *Alvarez.*

Additional litigation would impose tertiary burdens on the City's ability to conduct the business of government. Until the issuance of a formal court decision concerning the legality of the exam, the City would be forced either to suspend use of the test (and therefore perhaps all police recruit hirings) or else to assume the risk of ever-increasing liability, since each time it administers the challenged exam it creates a new class of potential claimants, many of whom might be entitled to backpay. Also, the City's previous attempt to perform a validation study of the test brought it into conflict with members of the police force, whose cooperation was needed, and their representatives. Nothing at the hearing suggested that such a breach in relations would not occur again if the City were compelled to commence a validation study under similar circumstances. The Consent Order lifts the City out of these dilemmas

and permits it to avoid operating its police force in an uncertain and unstable environment.

Although this case is relatively youthful and discovery has been minimal, counsel are intimately familiar with the *O'Neill* and *Alvarez* suits and are cognizant of the relative merits and inadequacies of their clients' positions. From the plaintiffs' perspective, the disparate impact of the test is obvious. The task of identifying and compiling the appropriate statistics that can support court-mandated relief in this evolving area of law, however, is potentially daunting. Similarly, the City, which has been down this particular Title VII road on many occasions, is at considerable risk that the Court will conclude that the exam is not sufficiently predictive of relevant work behaviors. That finding would expose the City to backpay liability in addition to perhaps even broader and more inflexible equitable measures than those contained in the decree, with the consequent greater loss of control over its hiring decisions. Yet, the Consent Order obviates the perils and vagaries of litigation by providing the species of relief which is most beneficial to members of the class—correction of the test's adverse impact—and which the City can provide at a low cost. As Judge Fullam noted in *O'Neill*, the "minor potential disruption" in the rank-order eligibility list "seems a small price for the benefits achieved—benefits both to the minority candidates, who have potentially valid claims for significantly greater relief and to white applicants, whose chances for actual hiring ... will, as a practical matter, be improved if the consent decree is signed." 100 F.R.D. at 360. The Consent Order, then, embodies a reasonable and sensible exchange under all the circumstances.

The mild reaction to the proposed Order bolsters the Court's conclusion that it should be approved. Even though the notice of hearing broadly authorized any person "affected" by the decree to comment on it, only one objection, apart from those posited by the FOP, was filed. That lone objection questioned the abstract fairness of race-conscious programs. The other letters that were related to the settlement supported it.

Second, the proffered Consent Decree is not illegal or inequitable. It is structured to address the plain racial imbalance between the relative test performances of black and white applicants. The uncontradicted evidence shows that such a statistically significant imbalance exists, that the test has not been validated, and that there is a substantial question about whether it ever can be validated. As such, the Court concludes that race-conscious measures are warranted to remedy conspicuous racial disparities in the police officer recruit selection process.

Contrary to the argument of the FOP, *Wards Cove* does not condemn the type of statistical data introduced to support the Consent Order. In that case, the plaintiffs challenged, pursuant to Title VII, an array of employment practices in two Alaskan salmon processing businesses. They submitted statistics demonstrating that while a large percentage of nonwhites held the unskilled, low-paying cannery jobs, a meager percentage of nonwhites filled the skilled, high-paying noncannery positions. Stating that "[t]he 'proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market,'" the Supreme Court held that the disparity upon which the complainants relied could not support a prima facie case of discrimination. 490 U.S. at ——, 109 S.Ct. at 2121 (quoting *Hazelwood School Dist. v. United States*, 433 U.S. 299, 308, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977)).

*Wards Cove* is thus distinguishable. As the decisions in *Johnson*, *Firefighters*, *Sheet Metal Workers*, and *Weber* make clear, the requisites of a prima facie Title VII disparate impact claim against an employer are inapposite when the remedial measures in controversy are implemented voluntarily. *See supra* part III.A. Further, even if the propriety of voluntary affirmative action were contingent on the establishment of a prima facie case, *Wards Cove* neither proscribes the utilization of applicant flow data in analyzing jobs that

require no special skills or training programs designed to provide expertise, *see Green v. USX Corp.*, 896 F.2d 801, 804–05 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 53, 112 L.Ed.2d 29 (1990), nor purports to disparage the substantial body of precedent which has approved the use of such data in the testing context. *See, e.g., Dothard v. Rawlinson*, 433 U.S. 321, 330–31, 97 S.Ct. 2720, 2727–28, 53 L.Ed.2d 786 (1977); *Albemarle*, 422 U.S. at 425, 95 S.Ct. at 2375; *EEOC v. Greyhound Lines*, 635 F.2d 188, 191 (3d Cir.1980); 28 C.F.R. § 50.14(16)(B) & (R); Comment, *When Doctrines Collide: Disparate Treatment, Disparate Impact, and* Watson v. Fort Worth Bank & Trust, 137 U.Pa.L.Rev. 1755, 1760 (1989); Waintroob, *The Developing Law of Equal Employment Opportunity at the White Collar and Professional Level*, 21 Wm. & Mary L.Rev. 45, 81–86 (1979).

The FOP also asserts that the contemplated remedial action is unlawful because the statistics do not reveal an adverse impact of sufficient magnitude. The FOP relies on the Uniform Guidelines' "four-fifths" or "eighty percent" rule, which states that

> [a] selection rate for any race ... which is less than four-fifths (⅘) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

28 C.F.R. § 50.14(4)(D). Again, because the guideline demarcates the disparity that usually is associated with a prima facie claim of discrimination, the FOP's argument misses the mark. The level of adverse impact needed to justify the voluntary implementation of race-conscious measures is manifest racial imbalance, which requires a lesser showing than that which would create a prima facie case against an employer. The statistics show that the pass rate of blacks is approximately 82% of the pass rate of whites. Even by the FOP's narrow interpretation of the rule,

that evidence suggests a borderline prima facie disparate impact claim and therefore amply demonstrates the existence of a manifest imbalance. *See Johnson*, 480 U.S. at 633 n. 11, 107 S.Ct. at 1453 n. 11; *cf. City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500, 109 S.Ct. 706, 724, 102 L.Ed.2d 854 (1989).

The Court finds that the means employed to address this imbalance neither unnecessarily trammel the interests of other racial groups nor create an absolute bar to their employment opportunities. First, the interests potentially impaired by the remedial scheme are minimal. Candidates who score well on non-validated employment examinations have no legitimate expectation of selection. *See Vulcan Pioneers v. New Jersey Dep't of Civil Serv.*, 832 F.2d 811, 816 (3d Cir.1987); *Vanguards*, 753 F.2d at 484–85. Moreover, the Consent Order does not divest anyone of a currently held position. A plurality of the Supreme Court explicitly noted in *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), that

> [i]n cases involving valid *hiring* goals, the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job.

*Id.* at 282–83, 106 S.Ct. at 1851.

Second, the interests that prospective applicants do reasonably hold are infringed little. The Consent Order's remedial measures are not activated unless a statistically significant disparity between the performances of black and white test-takers is identified. Even in that situation, the plan does not require the City to select or reject applicants exclusively because of race or hire unqualified blacks for the police officer recruit position, and the degree of correction is directly tied to the scoring disparities between black and white test-takers. There is no question that to cure the effects of prior or present discrimination, in-

nocent parties may be called upon to shoulder some of the onus that a narrowly tailored remedy engenders. *See, e.g., Fullilove v. Klutznick,* 448 U.S. 448, 484, 100 S.Ct. 2758, 2778, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J.); *Patterson,* 514 F.2d at 773. Indeed, under the proposed settlement, any possible deprivation is temporally circumscribed. As plaintiffs' counsel stated at the hearing, individuals who are passed over for additional processing because of the Consent Decree's operation will be selected for further consideration during the next round of hirings.

Last, the relief afforded by the Consent Order is of temporary duration. The objective of the plan is not to maintain a racial balance, but to remedy the underrepresentation of blacks in the training program. The Order specifies that its terms will expire in ten years or upon validation of a police officer recruit exam, whichever is earlier. Also, the City must immediately solicit and review proposals for an examination that minimizes or eradicates adverse impact on nonwhites and that can be validated. *See Johnson,* 480 U.S. at 639–40, 107 S.Ct. at 1456; *Weber,* 443 U.S. at 208, 99 S.Ct. at 2729; *Kromnick v. School Dist. of Philadelphia,* 739 F.2d 894, 911 (3d Cir. 1984).

The Court therefore cannot agree with the FOP's generalized contention that the Order discriminates against whites and other racial groups in violation of federal law. The burden of proving that a consent decree suffers from such an infirmity rests on those objecting to court approval of it, *see Johnson,* 480 U.S. at 626, 107 S.Ct. at 1449 (Title VII); *Wygant,* 476 U.S. at 277–78, 106 S.Ct. at 1849 (1986) (plurality opinion) (fourteenth amendment), and the FOP has introduced no evidence to support its assertion. Given the affirmative action dimensions of the *O'Neill* and *Alvarez* decrees, one would fully expect that the FOP could have documented such discrimination if it had occurred. Of course, in the event the proposed Consent Order does in fact unfairly impair the rights of other racial groups, adversely affected individuals may petition this Court to modify it. *See Mar-tin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989).

The Court also rejects the FOP's remaining attacks on the settlement. Many of the FOP's claims, such as that test is valid or that the Consent Order is the product of collusion between the plaintiffs and the City, rely on predicate facts not proven. The FOP was afforded every opportunity to substantiate its allegations, but it declined to do so. The FOP's complaint that the agreement runs afoul with various state and municipal enactments is irrelevant. "[I]t is axiomatic that state laws must fall when they hinder the effectuation of affirmation action decrees, even consent decrees." *Vulcan Pioneers v. New Jersey Dep't of Civil Service,* 588 F.Supp. 727, 731 n. 4 (D.N.J.1984).

The proposed Consent Order is fair, adequate, and reasonable. In consequence, it will be approved.

## ORDER AND FINAL JUDGMENT

AND NOW, this 16th day of October, 1990, for the reasons stated in this Court's Memorandum of October 16, 1990;

IT IS ORDERED that the proposed Consent Order, which is set forth as an Appendix and made a part of this Order, is APPROVED;

AND IT IS FURTHER ORDERED that, there being no reason for delay, the Clerk of Court is hereby directed, pursuant to Rule 54 of the Federal Rules of Civil Procedure, to enter this Order as a final judgment in the above-captioned action.

## APPENDIX

### CONSENT ORDER

WHEREAS, this action was instituted on April 5, 1990 by the above-named plaintiffs, who are Afro–American applicants for the City of Philadelphia civil service position of Police Officer Recruit who took the civil service qualifying written entrance examination administered by the defendants on December 16, 1989;

AND WHEREAS, subsequent to the defendants' January 12, 1990 certification of

an eligibility list based on the December 16 exam, the individually named plaintiffs duly filed charges alleging race discrimination in hiring by the defendants with the U.S. Equal Employment Opportunity Commission (hereinafter "EEOC") and thereafter filed this action seeking class certification and preliminary and permanent injunctive relief (as well as other remedial relief) pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–1 (hereinafter "Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the Civil Rights Act of 1871, 42 U.S.C. § 1983;

AND WHEREAS, the plaintiffs' EEOC charges, and the allegations in this action, claim that the defendants are engaging in unlawful race discrimination in hiring by using a written examination for the position of Police Officer Recruit which is not a genuine and reliable predictor of the quality of on-the-job performance in the position and which consistently results in a passing and eligibility rate for Afro–American applicants which is statistically significantly lower than the corresponding rate for white applicants;

AND WHEREAS, plaintiffs contend that the defendants' continuing practice of rejecting (i.e. failing) candidates, or placing them on the eligibility list in order based solely upon scores achieved on a written examination which has not been proven to predict actual job performance, is illegal under federal civil rights laws and should be enjoined;

AND WHEREAS, the parties agree that the City has utilized an exam originally prepared by Educational Testing Services ("ETS") and modified by the City in 1987 and 1989 which has had an adverse impact on Afro–American applicants;

AND WHEREAS, the City again administered an ETS examination in June 1990 and may use it later in 1990 and beyond 1990 if necessary;

AND WHEREAS, ETS is no longer marketing an examination for police applicants;

AND WHEREAS, the ETS exams used in Philadelphia and other cities to date have never been found by a court to be valid predictors of an applicant's ability as a police officer;

AND WHEREAS, the named representative plaintiffs, the plaintiff classes, and the defendants, desirous of avoiding litigation over the issue of the validity of tests to predict the ability of applicants to perform as officers, and desirous of ensuring the promotion of equal opportunities within the Philadelphia Police Department without delaying through litigation the processing of candidates for the position of Police Officer Recruit, hereby agree and consent to the entry of this Order as a final Order with respect to all of the issues raised in the Complaint;

AND WHEREAS, it is agreed that this Order is entered with their consent in full and complete settlement and satisfaction of all issues which were or could have been raised in this litigation and that upon the entry of this Order, and subject to the provisions of this Order, this litigation is terminated with prejudice. Further, the individual plaintiffs agree to withdraw with prejudice their charges filed before the EEOC (Freeman—charge # 170900458; Ladson—charge # 170900461; and Jordan charge # 170900498);

AND WHEREAS, the Court has determined that this Order is a fair, adequate, and reasonable settlement of this action, and that the obligations imposed upon the defendants by this Decree are proper under law, including 42 U.S.C. §§ 1981, 1983; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.;* and the Constitutions of the United States and the Commonwealth of Pennsylvania, and that the Order will not result in discrimination under those statutes, and that it is within the Court's equitable powers under those laws;

NOW THEREFORE, this ___ day of _____, 1990, after full hearing and consideration of the matters before the Court, this final Order is hereby DECREED, with the consent of the parties:

## I. JURISDICTION

1. This Court has jurisdiction to enter preliminary and permanent injunctive relief pursuant to 42 U.S.C. §§ 1981 and 1983 and 42 U.S.C. § 2000e–5(f)(2). By letter from plaintiffs' counsel to the EEOC dated January 25, 1990 plaintiffs requested that the United States seek preliminary injunctive relief pursuant to Title VII, 42 U.S.C. § 2000e–5(f)(2). To date the United States has not responded or otherwise acted. Thus this Court also has jurisdiction to enter preliminary and/or final injunctive relief under Title VII.

## II. ISSUES LITIGATED

2. Nothing in this Consent Decree shall affect, be interpreted as expanding, modifying, or otherwise altering the obligations of the City of Philadelphia, its officials and employees (hereinafter "City"), insofar and to the extent that any such obligations remain, under the Consent Decrees in *Commonwealth of Pennsylvania, et al. v. O'Neill, et al.*, C.A. No. 70–3500; *Brace v. O'Neill, et al.*, C.A. No. 74–339; *U.S. v. City of Philadelphia*, C.A. No. 74–400; *Sanford, et al. v. O'Neill, et al.*, C.A. No. 78–1154; and *Alvarez, et al. v. City of Philadelphia*, C.A. Nos. 79–375 and 79–1192. Nothing in this decree shall in any manner limit or alter the rights of any persons of any race who passed the December 1989 examination and who have been appointed as Police Officer Recruits.

## III. CLASS CERTIFICATION

3. The parties agree to, and pursuant to Rule 23 of the Federal Rules of Civil Procedure the Court hereby certifies, the following plaintiff class:

(a) All Afro–American applicants who were notified that they failed the written examination administered on December 16, 1989 (approximately 470 in number);

(b) All Afro–American applicants who received a passing score on the December 16, 1989 examination but were not selected in the group to be processed for appointment to the first class of Police Officer Recruits because of the use of an eligibility list based on rank order scores on the examination (approximately 1200 in number); and

(c) All Afro–Americans who will take a Police Officer Recruit examination which is scheduled to be given by the defendants in June 1990.

4. With respect to the above class the Court finds, and the parties hereby agree, that (a) the class is so numerous that joinder of all members is impracticable, (b) there are questions of law or fact common to the class, (c) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (d) the representative parties will fairly and adequately protect the interests of the class.

5. With respect to the above class the Court further finds, and the parties hereby agree, that the party which would otherwise oppose the class (the City) can be found to have acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; and that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## IV. INJUNCTION

6. The City is hereby enjoined from certifying an eligibility list based on any written examination for the civil service position of Police Officer Recruit (or equivalent entry level position) in which Afro–American applicants have a passing rate which is less than the passing rate of applicants in the racial group having the highest passing rate by a statistically significant amount or in which the percentage of Afro–Americans in the top 1000 on the eligibility list is less than the percentage of Afro–Americans who passed the test by a statistically significant amount, unless: (a) this Court has found after an appropriate hearing that the test and its method of scoring (pass/fail or rank order) has been validly shown to predict performance of applicants as police

officers; or (b) the provisions of paragraph 8 are complied with.

7. Subject to the provisions of paragraph 6, nothing in this Consent Decree, shall limit, or be interpreted as limiting the City's ability to take steps to alter or replace existing written entrance examinations with other examinations which the City deems to be of increased validity. Moreover, nothing in this Consent Decree shall limit, or be interpreted as affecting the City's discretion to alter or replace existing methods of scoring future examinations provided that such steps are intended to assure compliance with paragraph 6.

## V. SELECTION OF RECRUITS

8. (a) During the duration of this Consent Order, the appointment of Afro–Americans to the position of Police Officer Recruit (or equivalent entry level position) shall be at least at the same rate as the percentage that Afro–Americans are of test applicants. (Applicants shall hereinafter mean test takers.) That is, for each 100 candidates appointed by the City as Police Officer Recruit, the number of Afro–American appointments shall always equal at least the percentage that Afro–Americans were of all applicants who took the test multiplied by 100.

(b) If the City adopts a process of continuous testing, the appointment rate will be based on the percentage that Afro–American test takers were of all test takers for tests given in the preceding six month period, as reported pursuant to paragraph 18. If either party concludes after six months under this subparagraph that an adjustment is needed so that the appointment rate adequately reflects applicant flow rates, the parties may jointly revise this provision or, if unable to agree, may apply to the Court.

(c) Nothing herein shall preclude the City from placing candidates on each eligibility list by rank order according to their scores, by random selection, or by any other method which it may lawfully pursue; this order shall not be deemed to require

pass-fail grading which may be utilized only if in accordance with state law.

(d) If there are insufficient Afro–Americans remaining on an eligibility list to comply with this paragraph, the City shall discontinue use of that list, unless the City chooses to select Afro–Americans from a newly certified list while continuing to use a prior eligibility list for selecting other candidates for the purpose of meeting the requirements of this paragraph 8.

(e) Nothing herein shall be interpreted as guaranteeing or requiring that any particular Afro–American candidates be hired.

## VI. INDIVIDUAL RELIEF

9. Plaintiff Michael Jordan, who passed the written examination administered on December 16, 1989, and whose name appears on the current eligibility list ranked at 3481, shall promptly be notified by the City that he will be selected for further screening and processing. Said notice shall include an approximate date upon which plaintiff Jordan can expect to be called for the next screening step.

10. Plaintiffs Freeman and Ladson, who were notified that they failed the written examination administered on December 16, 1989, shall be notified by the City of the next examination date. Prior to that date the City shall offer said plaintiffs an opportunity for an individualized training session.

## VII. CLASS RELIEF

11. (a) Those class members who passed the December 16, 1989 or June 1990 examinations shall be selected on the basis of paragraph 8. To the extent any selections for processing have been made from the respective eligibility lists prior to entry of this Order on a basis inconsistent with paragraph 8, future appointments from the June examination list (or a subsequent list if necessary) shall be adjusted so that the overall appointment rate for Afro–Americans shall be in compliance with paragraph 8 no later than when the total number of persons appointed after this Order is entered equals the total number appointed prior to entry of this Order. For the pur-

pose of this paragraph only, the applicant flow rates of paragraph 8 shall be adjusted with respect to the December exam to delete persons of all races who passed the exam and were called for processing but did not report or withdrew from consideration.

(b) All class members who did not pass the December 16, 1989 or June 1990 examinations shall be given notice of the next examination for Police Officer Recruit after this order and the City shall, after appropriate notice, conduct a training session specifically for such class members in a timely fashion prior to that entrance examination.

## VIII. DEVELOPMENT OF NEW EXAMINATIONS

12. The City shall publicly solicit proposals for a Police Officer Recruit examination which shall minimize adverse impact on minorities and which shall have been or can be validated. The announcement of such solicitation shall be issued within 45 days of this Order. The Personnel Director shall file a report with the Court within 120 days of receiving the proposals stating his reasons for selecting or rejecting each of the proposals received. All information available to the City in connection with analyzing the proposals shall be shared with counsel to the parties.

## IX. RECRUITMENT AND TRAINING

13. The City shall continue its current efforts to promote the interest, application, and hire of qualified Afro–American candidates for the position of Police Officer Recruit.

14. In order to facilitate and increase the effectiveness of the City's recruitment efforts, during active recruiting periods, the Police Department shall assign Police Officers to perform recruitment duties as their primary function.

15. (a) Until and unless the City shifts to the administration of continuous, rather than periodic civil service written entrance examinations for the position of Police Offi-

cer Recruit, the City shall conduct or sponsor at least one (1) training session prior to the date of each examination so that prospective test takers may be assisted in their preparation for such examinations. The City may employ the Guardian Civic League (an association of Afro–American police officers) or an equivalent organization. Plaintiffs shall be notified and consulted about any equivalent organizations to be selected by the City.

(b) If the City utilizes a test for which prior training is inappropriate, the City shall notify plaintiffs and shall not have to conduct or sponsor any training.

16. If the City shifts to the administration of continuous written entrance examinations for the position of Police Officer Recruit, the City shall similarly conduct or sponsor training sessions on a regularly scheduled, year-round basis.

17. The City shall increase its efforts to locate and encourage Afro–American test takers who pass the written entrance examination for the position of Police Officer Recruit, but who do not report for further screening and processing. As part of these efforts, the City shall cooperate with the Guardian Civic League and equivalent organizations in trying to locate such persons.

## X. NOTICE AND REPORTING REQUIREMENTS

18. (a) The City shall advise counsel for the parties 30 days before the announcement of any exam of its intention to hold the exam; the type exam; what organization shall provide the questions or score the exam; the basis for scoring the exam; and any other information which counsel may reasonably request. The City shall provide to counsel to the parties as soon as practicable after the test, but no less than 14 days prior to the date on which names are certified from any eligibility list, the percentage for each race taking the exam, the percentage for each race passing the exam, and the percentage for each race in each 1000 rank order, if applicable. A copy of the final eligibility list shall be provided counsel as soon as it is certified.

(b) Within 30 days of the completion of each calendar quarter ending March 31, June 30, September 30 and December 31 the City shall report the racial composition of all those persons (i) called from the eligibility list for final processing, the racial composition of those persons passed, rejected or held in each stage of the processing, and the race of all appointments to the position of Police Officer Recruit (or equivalent entry level position), the racial composition of each police academy class begun during the period, the racial composition at the time of graduation during the period.

(c) Any additional information which counsel to the parties may reasonably request in order to ascertain compliance with this Consent Order, including any information concerning any studies conducted to validate any exam.

19. All required notices to counsel shall be sent by first class mail or hand delivered to the offices of the Public Interest Law Center of Philadelphia, 125 South 9th Street, Suite 700, Philadelphia, Pennsylvania 19107, 215–627–7100.

## XI. DURATION OF ORDER AND CONTINUING JURISDICTION OF THE COURT

20. (a) The rights and obligations under paragraphs 6, 7 and 8 of this Consent Order shall expire after (i) the City has created an eligibility list for Police Officer Recruit based on an examination in which Afro–American applicants have a passing rate which is not less than the passing rate of applicants in the racial group having the highest passing rate and where the percentage of Afro–Americans in the first 1000 persons on the eligibility list is equal to their percentage on the entire list, or based on an examination which this Court has determined to be a valid predictor of performance as a police officer or (ii) 10 years, whichever is earlier.

(b) The rights and obligations under all other paragraphs shall continue through the expiration of the next eligibility list created after the termination of this Order under paragraph (a) above.

(c) The Court shall retain jurisdiction to modify, amend, and enforce this Order and to make a determination upon petition by defendants whether an examination is a valid predictor of performance.

## XII. COUNSEL FEES AND COSTS

21. The City shall promptly review and consider requests for statutory attorneys' fees and costs from plaintiffs' counsel upon submission to the City of time/activity entries, hourly rates and other appropriate information. Any disputes may be presented to the Court upon appropriate petition.

## XIII. RELEASE

22. For and in consideration of this Consent Order as set forth in the preceding paragraphs, the named plaintiffs and the class they represent, agree and consent to the entry of this Order as a final order with respect to all of the issues in this litigation, and do hereby remise, release, and forever discharge the defendants, their agents, servants, or employees, from any and all liability, actions and causes of actions, claims, and demands whatsoever in law or equity which have heretofore arisen in this action or which could have arisen from this action prior to the date of this Order, including but not limited to challenges as to the legality of the December 16, 1989 entrance examination, to the January 12, 1990 certification of an eligibility list and to the June 1990 examination.

/s/ Frank Finch, III

FRANK FINCH, III, ESQUIRE

1616 Walnut Street, Suite 1910

Philadelphia, PA 19103

(215) 545–1960

/s/ Ralph J. Teti

RALPH J. TETI, ESQUIRE

SUSAN SHINKMAN, ESQUIRE

Chief Deputy, Special Litigation

Law Department

City of Philadelphia

Attorneys for Defendants

/s/ Michael Churchill

MICHAEL CHURCHILL, ESQUIRE

Public Interest Law Center of Philadelphia

125 South 9th Street, Suite 700

Philadelphia, PA 19107

(215) 627–7100

Attorneys for Plaintiffs

June ___, 1990

APPROVED and ENTERED this 16th day of October, 1990.

/s/ Raymond J. Broderick