**Philip A. GARLAND, Plaintiff,**

**v.**

**USAIR, INC., et al., Defendants.**

**Civ. A. No. 86–890.**

United States District Court,
W.D. Pennsylvania.

April 25, 1991.

Michael L. Rosenfield, Jon Pushinsky, Martin M. Horowitz, for Philip Garland.

Sidney Zonn, Susand S. Sauntry, for USAir.

Larry A. Silverman, Michael E. Abrams, for Airline Pilots Ass'n.

## FINDINGS OF FACT

ZIEGLER, District Judge.

1. Plaintiff, Philip A. Garland, is a black male who filed a civil action for money damages, declaratory and injunctive relief against defendants, USAir, Inc., and the Air Line Pilots Association, based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

2. Plaintiff Garland contends that USAir violated Title VII, 42 U.S.C. § 2000e–2(a)(1), and 42 U.S.C. § 1981, by failing to hire him and hiring less qualified white applicants for the position of pilot. Mr. Garland also claims that he was ha-

rassed and suffered retaliation in violation of Title VII.

3. Jurisdiction is based on 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1343(a).

4. Plaintiff Garland has satisfied all administrative prerequisites to the filing of this action, including filing written charges with the Equal Employment Opportunity Commission; investigation by the agency; a finding of reasonable cause to believe that USAir violated Title VII by failing to hire because of race; receipt of a notice of the right to sue; and the timely filing of a complaint.

5. Defendant USAir, Inc., published objective criteria for hiring pilots in a Flight Operations Manual. In the April 24, 1981 insert to the Manual, USAir stated that pilot hires should have, *inter alia,* approximately 1,200 total hours of flying experience with a large percentage of multi-engine and/or heavy aircraft experience, and a high school diploma with college background preferred. The insert of December 25, 1981, called for approximately 2,000 hours of total flying experience with a large percentage of multi-engine and/or heavy aircraft experience, a high school diploma and a minimum of two years of college. The insert of March 2, 1984 contained the same requirements as the December 25, 1981 insert.

6. From 1981 until 1987, Donna Formoso was the pilot recruitment coordinator who worked for the Vice Presidents of Flying, Ronald Sessa (1980–1983) and William Leefe (1983–1988). Miss Formoso screened the applications that USAir received and selected those applicants who met objective qualifications. She then transmitted the file to Captains Sessa and/or Leefe for their consideration for interview. She learned the required qualifications from discussions with Captains Sessa and Leefe and through her experience on the job. Captain Sessa or Captain Leefe only received applications that met the minimum qualifications. Ms. Formoso testified that she kept a separate file that contained the applications of black pilots. This file contained approximately ten applications at any time.

7. Although all applications were to be processed by Ms. Formoso, an alternative hiring channel existed wherein relatives, friends and applicants sponsored by influential persons were referred directly to Captains Sessa or Leefe. These applications by-passed screening for minimum qualifications by Ms. Formoso. Captain Sessa or Leefe then reviewed these applications and told Ms. Formoso whether to schedule these individuals for interview. In the period 1981–84, 463 pilots were hired, 19 of whom had relatives at USAir and at least 39 of whom had influential, non-relative referrals. All of these 58 applicants were white.

8. At or prior to an interview, Captains Sessa and Leefe would review the applicant's application. The first page contained the following question: "Do you have any relatives working for USAir?" They also received a summary of the person's qualifications, prepared by Ms. Formoso, which included a section "Referred by."

9. The 17 black pilots hired in 1981–1984 were processed by Ms. Formoso and, at a minimum, satisfied the written objective qualifications published in the USAir Flight Operations Manual.

10. Every pilot who was hired through the alternative hiring channel, which by-passed screening by Ms. Formoso, was white. Some of the pilots hired through this channel failed to meet the minimum objective written qualifications that USAir established. In assessing the qualifications of these applicants, the Vice President of Flying used undefined, subjective and reduced standards which were unknown to anyone else. This channel was not open to qualified black applicants.

11. Captain Sidney Clark, a black pilot, testified that he was told to use the objective qualifications for pilots which were published in the USAir Flight Operations Manual. He submitted 130–140 applications of black pilots who met or exceeded the minimum qualifications to Ms. Formoso, the pilot recruitment coordinator, not to the Vice Presidents. Only 8 or 9 of these

referrals were interviewed and only 3 were hired.

12. Captain Clark testified that he submitted the applications of two graduates of the United States Air Force Academy, which Captain Leefe said would be an extremely impressive credential. Neither graduate of the Air Force Academy was interviewed.

13. Captain Clark testified that he encountered such lack of success in getting qualified black applicants interviewed that he concluded that submission of an application by him was detrimental to the applicant. He testified that he instructed one applicant not to say that he knew Captain Clark. When that applicant said at his interview that he did not know Captain Clark, he was hired.

14. Captain Clark was a credible witness who testified without apparent bias to either party. He substantiated the failure of USAir to hire qualified black pilot applicants whose applications were hand-delivered to Ms. Formoso.

15. Philip A. Garland was an experienced airline pilot when he applied for hire with USAir by submitting a resume in March 1981 with a photograph which showed that he was a black male. He submitted a formal application in July 1981 together with a photograph.

16. Although he submitted an application in July 1981, Garland was not interviewed by USAir until October 1982 at which time he was found to be qualified. Captain Garland was hired in December 1984.

17. During the fifteen months that Plaintiff Garland waited to be called for an interview, USAir continued to interview white applicants, many of whom were less qualified than plaintiff. The court finds that USAir hired a number of white relative and influential referral applicants, as well as less or equally qualified white applicants, while Captain Garland waited to be hired.

18. Of the other nine applicants who were interviewed with Mr. Garland on October 20, 1982, all of whom were white, two were found unacceptable and one failed the simulator test. That applicant was retested on the simulator in November 1982 and found qualified. She was hired in December 1982. Of the eight candidates who were found to be acceptable, all but Captain Garland were offered positions immediately. One refused, and the other six were hired in the period November 1982 to January 1983, before Captain Garland was hired.

19. Plaintiff Garland received a lower experience rating than 24 of the 39 white pilot applicants identified as having influential non-relative referrals, despite the fact that he had more total flight hours than 37 of the 39 applicants and more multi-engine flight hours than 31 of the 39 applicants. Only 8 of the 39 were airline pilots.

20. Plaintiff Garland received a lower background rating than 19 of the 30 "influential referral group" applicants despite the fact that he had an ATP certificate and 11 members of this group did not; plaintiff had a flight engineer certificate and 26 members did not; and he had an FAA type rating on jet aircraft and 27 had neither an FAA type rating on jet aircraft nor turbo prop aircraft.

21. Professor James Kenkel concluded, and this court finds that, based on objective criteria, Captain Garland should have been given higher subjective scores for background and experience.

22. Captain Garland should have been interviewed and hired shortly after submitting his application in July 1981. USAir did not hire him with the November 1982 class when Captain Sessa testified that he was qualified or with the March 1983 class when there was no question that he had successfully completed all phases of the interview process.

23. Dr. James Kenkel, a professor in the Economics Department at the University of Pittsburgh, performed a statistical

analysis of 91 individuals who had applied for pilot positions at USAir during the period in question. The results of the study are contained in a summary report and a statistical report which were filed with plaintiff's pretrial narrative statement.

24. Professor Kenkel reached the conclusion that, based on objective data which he used, Captain Garland was the most qualified applicant in his interview group and among the top eight applicants of the 91; yet he was not hired until almost three and one-half years after he had applied.

25. Professor Kenkel concluded, and this court finds that:

A. USAir did not hire the most qualified applicants. Captain Garland was better qualified than many of the applicants who were hired.

B. Captain Garland was better qualified than the typical white applicant in his sample.

C. Captain Garland was better qualified than the typical applicant who had a relative at USAir.

D. Captain Garland was better qualified than the typical applicant who had an influential non-relative referral.

E. Captain Garland was better qualified than the typical applicant who was deficient in some way based on USAir's published hiring standards.

F. Captain Garland was better qualified than the typical applicant who applied prior to January 1, 1982; and

G. Captain Garland was better qualified than the typical applicant in his interview class.

26. Professor Kenkel opined, and this court finds that, based on his study of objective criteria which he used to evaluate Captain Garland and the other pilots in the study group, Captain Garland was discriminated against on the basis of his race.

27. USAir did not hire the best qualified pilot applicants. From Dr. Kenkel's testimony it can be concluded that Captain Garland was not hired earlier because of race.

28. The evidence by which it may be inferred that this disparate treatment by USAir was intentional is summarized as follows:

A. Captains Sessa and Leefe followed two separate standards for hiring pilots. One standard was the written qualifications in the Flight Operations Manual which Ms. Formoso and Captain Clark followed in selecting applicants for interview. That standard applied to all black applicants. The second standard was one which was relaxed when applied to select white pilots such as Robert Burdick, Robert Knapp, Charles Buttion and William Lacey. These pilots were interviewed, and at least three were hired, when they failed to meet the minimum written standards for flying experience and/or education. No black applicant had these minimum standards "relaxed" as was done for these white pilots;

B. Captain Clark's testimony proved that he took the applications of more than 100 qualified black pilots to Ms. Formoso, only 8 or 9 of whom were interviewed and only about 3 of whom were actually hired. Since the court finds Captain Clark to have been a credible witness, USAir's conduct showed an intentional disregard for the great number of qualified black applicants in the interviewing and hiring process;

C. USAir provided different reasons for not hiring Captain Garland to the EEOC, in its answers to requests for admissions filed in discovery and in its pretrial statement filed pursuant to Local Rule 5 and at trial. These inconsistencies establish an intentional pretext for the real reason for not hiring Captain Garland which was race;

D. USAir asserted in its pretrial statement and at trial that Captain Clark was its black pilot recruiter and that black pilot applicants were hired through him. "Thus, black pilots actually had two channels available to them: the normal channel for friends and relatives of USAir employees and the 'Sidney Clark' channel designed specifically for black applicants." This assertion was false and rebutted by Captain

Clark who characterized the "Sidney Clark" channel as valueless;

E. The record supports a finding that USAir failed to use its best efforts to find and hire qualified black applicants, and that USAir intentionally failed to interview and hire qualified black applicants such as Captain Garland.

F. While USAir hired two minority pilots (Carol Lopez a female and Manuel Lopez a Hispanic) as exceptions to the LPP rule, it failed to make any similar exception for blacks.

G. USAir maintained a separate hiring channel for the benefit of white pilot applicants with relatives at USAir or referrals from influential non-relatives. The opportunities presented by access to the alternative or "Vice President's" channel were more favorable than those through the normal channel. The former channel was available to white pilots only. USAir's practice of hiring white pilots through this channel intentionally discriminated against qualified black applicants;

H. Black applicants who satisfied the minimum objective standards of the Flight Operations Manual were perceived as unqualified while white pilots who did not meet these minimum objective standards were perceived as qualified. Evaluating the subjective ranking of Captain Garland on the parameters of "background" and "experience" against the objective measures of his qualifications, Dr. Kenkel concluded with respects to both parameters that the "ratings for Phil Garland [were] much lower than the ratings he should have received based on objective criteria."

29. Defendant's evidence was not credible with regard to Captain Garland and is pretextual because:

A. Captain Garland stated on his application that his furlough from Western Airlines was imminent.

B. On the interview summary form for Captain Garland under the category "previous employer" is stated "Western Airlines."

C. Captain Sessa wrote on Captain Garland's interview sheet "should make good employee."

D. Another Western Airlines pilot, Stephen Lapensky, a white male, was hired while he was actively employed.

E. USAir had knowledge that Western Airlines was in the process of furloughing pilots. This knowledge is established by the fact that Captain Sessa had hired at least three white furloughed Western Airlines' pilots, Thomas Bibbins, Christopher Beebe and Bill Eggers, in 1981.

F. USAir would not have gone through the expense of retesting Captain Garland on the psychological test in January and February 1983 if plaintiff was ineligible for employment because he was still actively employed at Western Airlines; and

G. Captain Garland received written notice from Western Airlines that he was furloughed as of September 1981, and he was not recalled from furlough until April 1983.

30. Defendant's evidence that it hired only the best pilot applicants was not credible because exceptions were made for whites not meeting USAir's minimum standards of 2,000 total hours including 1,000 multi-engine and/or heavy aircraft hours and a background in commercial flying:

A. In 1983 USAir hired Robert Burdick, who was white, as a favor to his father who was a USAir Captain, and who, when interviewed a year before being hired, had only 71 multi-engine hours and no commercial pilot experience.

B. In 1982 USAir hired Robert Knapp, who was white, one month after his interview at which time he had only 1,435 total hours of which 315 were multi-engine hours, and whose background was as an advertising banner pilot, as a favor to his father who was a USAir captain; and

C. In 1984 USAir hired Charles Buttion, who was white, while he had fewer than 2,000 total hours and 1,000 multi-engine hours as a favor to his father who was a vice president at Eastern Airlines.

31. USAir's asserted reason for not hiring Captain Garland, because he was not LPP, does not constitute a legitimate business reason and is found to be pretextual.

32. The reasons which USAir gave the EEOC for not hiring Captain Garland did not constitute legitimate business reasons and were a pretext for not hiring him because of his race.

33. The response which USAir gave during discovery in the instant case to Request for Admission number 10 for not hiring Captain Garland is as follows:

Mr. Garland was not hired until December 1984 for a number of reasons including: (1) Mr. Garland's overall qualifications including the results of the psychological aptitude test were not as favorable as other available applicants; (2) USAir believed that he was actively employed at Western; and (3) for some periods during that time USAir was required under federal law to give a first right of hire to applicants protected under the Airline Deregulation Act and Mr. Garland was not so protected.

34. The psychological aptitude test used to screen applicants, ASI, was not validated by USAir. Captain Leefe testified that the results of the ASI, which was ultimately abandoned by USAir with no discernable effect on the ability to evaluate applicants, were not used to disqualify an otherwise qualified candidate. Captain Garland successfully completed the interview process, including the simulator test and the physical, and was otherwise qualified for hire in October 1982. The explanation that the ASI result was "not as favorable as [for] other available applicants" was likewise a pretextual reason for not hiring him. At a minimum, USAir has conceded that Captain Garland obtained a substantially better result on the ASI retest in February 1983 yet he was not hired into the March 29, 1983 class.

35. USAir asserted a new defense at trial when Captain Sessa testified that Captain Garland lacked pilot in command multi-engine time because so much of his time was served as a second officer on the B–737. Nowhere in the USAir Flight Operations Manual did it state that the multi-engine time had to be pilot in command time. Captain Garland's application and interview summary indicate that he had 5,000 hours total flight time with 3,000 of those attributable to multi-engine/heavy aircraft.

36. The evidence demonstrates the existence of a specific hiring practice maintained by USAir which has been operated for the benefit of white applicants, particularly those with relatives at USAir or who were referred to the Vice Presidents of Flying by influential persons.

37. The white applicants were routed through a "back door" directly to the Vice Presidents of Flying, or "Vice President's Channel," and as a result were the beneficiaries of a relaxation of the stated objective minimum qualifications of the Flight Operations Manual. Applicants through the "Vice President's Channel" were interviewed and in some cases hired with less than the minimum stated objective qualifications.

38. Captain Sessa testified that he could "bend the rules" for those who came highly recommended by allowing the interview and even hire an applicant with qualifications below the stated written minimum qualifications. This preferential treatment in deviation of stated company policy was accorded to white applicants alone.

39. No black applicants were interviewed or hired through the "Vice President's Channel." Each black applicant hired by USAir, including Captain Garland, was interviewed and hired only after he passed the screening process of the recruitment coordinator who determined that he met or exceeded the objective minimum qualifications.

40. Being interviewed via the alternative "Vice President's channel" was an important factor in being favorably considered for hire as a pilot for USAir.

41. A pilot applicant whose application was processed via the alternative "Vice President's channel" would be interviewed

and hired in a relatively short period of time compared to those, including Captain Garland, who went through Ms. Formoso's screening process.

42. Samuel Kademenos was a personal friend of and referral from Captain Sessa, while he was the Vice President of Flying.

43. Mr. Kademenos submitted his application on September 27, 1982; Mr. Sessa interviewed him and Captain Garland on October 20, 1982; and he was hired in November 1982 while Captain Garland was passed over.

44. Despite efforts of Defendant USAir to characterize a separate but equal path for blacks, denominated as the "Sidney Clark Channel," the uncontroverted testimony of Captain Clark, a credible witness, was that no such channel existed. Applications received from Captain Clark were forwarded to the recruitment coordinator for her ordinary screening process. Captain Clark testified that he had no direct access to the Vice Presidents.

45. Defendant's effort at trial to characterize the "Vice President's Channel" as a "single back door" available to blacks and whites equally was discredited by the testimony. The evidence revealed that the access to the "Vice President's Channel" was available to white pilot applicants exclusively. Captain Clark's testimony confirmed that USAir employed a hiring practice which had a disparate impact on qualified and available black applicants.

46. The significance of this separate employment practice to USAir is demonstrated by its employment application which on its face asks, "Do you have any relatives employed by USAir?", by its interview summary sheet which on its face requests the name of the individual the applicant was "Referred by," and manifested by the deference accorded the minimally qualified applicants processed through the "Vice President's Channel," by the relative speed with which applicants were interviewed and hired through this channel and by the practice of a set aside or quota of one vacancy for every two hiring classes of pilot applicants through this channel.

47. USAir has failed to prove any business justification for the maintenance of the discriminatory alternative channel. Captains Sessa and Leefe testified that they were inundated with qualified pilot applicants such that they could pick the "cream of the crop." Similarly, both Vice Presidents testified that there was a dearth of qualified black applicants. No business justification is present in the maintenance of an all white recruitment and hiring channel when there was an ample availability of qualified whites and an asserted dearth of qualified black applicants. USAir's efforts to justify the maintenance of the "Vice President's channel" by contending that a separate but equal channel was available to blacks through Captain Clark is not supported by the evidence. The attempt by USAir to prove that the results of the operation of this hiring practice were *de minimus* is unpersuasive. The evidence demonstrates the hiring of at least 58 relatives and influential non-relative referrals out of 463 hires during the pertinent period and the perpetuation of this practice operated to the detriment of 50 to 60 qualified and available black pilot applicants provided by Captain Clark during this same period.

48. USAir had a policy that a pilot who was flying to his destination in order to commence a flight could fly in the "jump seat," i.e., an extra seat in the cockpit, if (s)he reserved it in advance. In 1987 Captain Garland was subjected to several incidents wherein he was ejected from the "jump seat," which he had reserved, by white pilots because he had filed the instant suit. At a preliminary hearing held in September 1987 USAir took the position that it could not take remedial action because the pilots who ejected Mr. Garland were the captains of the ship.

49. By condoning these attacks on Captain Garland by its white pilots, USAir has failed to protect Captain Garland's right to

be a litigant in the federal courts for which injunctive relief is required.

50. Captain Garland was subjected to other incidents of harassment which had a racial/retaliatory animus: Captain Kaufman, an officer of defendant Air Line Pilots Association ridiculed Captain Garland in front of other pilots as being the one who sued the company. This was an attempt to ostracize Captain Garland. Other captains wrote letters to Captain Leefe which unfairly criticized Captain Garland. Not only did Captain Leefe fail to take corrective measures against these captains who harassed Captain Garland, but he himself harassed Captain Garland by insisting that Captain Garland, but not similarly situated white pilots, resign his seniority from Western Airlines while he was still in his first probationary year at USAir.

## CONCLUSIONS OF LAW

1. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer:

> [T]o fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race [or] color....

42 U.S.C. § 2000e–2(a)(1). Not only does Title VII prohibit the failure to hire an individual on account of race or color, it provides additional protection in that it is unlawful for an employer:

> [T]o limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities....

42 U.S.C. § 2000e–2(a)(2).

■ 2. Captain Garland's claim that USAir's failure to hire him until December 1984 is also actionable under 42 U.S.C. § 1981 which guarantees black citizens the same right "to make and enforce contracts ... as is enjoyed by white citizens." The legal standards for establishing a right to relief under a § 1981 failure to hire claim are the same as those which have been adopted for proving a Title VII case. *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 2377–2378, 105 L.Ed.2d 132 (1989).

■ 3. Captain Garland has proffered two theories of a discriminatory failure to hire which are supported by the evidence: disparate treatment and disparate impact. Initially, he has proven by a preponderance of the evidence that he was the victim of disparate treatment on account of his race. That is, USAir continued to interview and hire lesser or equally qualified whites while taking no action on his own application. The evidence further establishes, and the court concludes, that USAir acted with discriminatory intent and that USAir's asserted reasons for not interviewing or hiring Captain Garland are pretextual. Secondly, the evidence establishes that Captain Garland was the victim of a specific hiring procedure having an adverse disparate impact on blacks. The specific policy challenged by Captain Garland was USAir's operation of a Vice President's hiring channel, unsupported by any legitimate business justification, which granted special preference to white applicants with relatives employed by USAir or with influential references.

■ 4. Where the use of non-job related criteria, such as whether an applicant is related to another employee, or whether an applicant is supported by an influential individual, has an adverse impact on the employment opportunities of minority applicants, employment discrimination is present. *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130 (1982).

5. According to the evidence presented to the court, USAir hired less qualified pilots than Captain Garland. Examples of differential treatment on account of race are the 17 white flight officers with relatives employed at USAir and 39 white flight officers whose employment applications were supported by non-relative influ-

ential referrals who were hired, during the pertinent time period. Special preference was given to these white applicants and word of mouth hires, some of whom did not meet USAir's written objective minimum hiring standards. No black applicant was accorded the preferred treatment and consideration given to this pool of white applicants.

6. In *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); the Court, commenting on the allocation of burdens set forth in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), noted that a plaintiff need only prove that he applied for a position for which he was qualified "but was rejected under circumstances which give rise to an inference of unlawful discrimination." Captain Garland satisfied the burden of proving a prima facie case of disparate treatment race discrimination as follows:

A. He presented convincing evidence that he was a qualified black applicant who was eligible for employment as a flight officer with USAir when he submitted his employment application in July, 1981. Captain Garland was not interviewed by USAir's Vice President of Flying until October, 1982. He was not offered employment until after he filed a charge of employment discrimination with the EEOC in November, 1984;

B. During the time Captain Garland was waiting to be called for an interview, USAir continued to interview white applicants, many of whom were not as objectively qualified as Captain Garland. Some of these less qualified white applicants were interviewed either as the result of having a relative or other influential sponsor. The evidence also establishes that USAir continued to hire white relative and influential referral applicants, as well as lesser qualified white applicants, during the three years between Captain Garland's application in 1981 and his hire in 1984; and

C. Captain Garland was the only black in his October, 1982 interview class. Seven of the other nine members of his interview class were offered employment before Captain Garland. Six of the seven accepted and were hired within three months of the interview. The time lag between the submission of Captain Garland's application and his ultimate hire exceeded the average time lag for many whites with relative employees, influential referrals or deficiencies in the objective hiring criteria identified by USAir.

7. USAir attempted to counter Captain Garland's prima facie case by denying that it treated Captain Garland less favorably than whites who had applied during the same time period. The court gives credence to the evidence that specific white applicants were given preferential treatment. Thus, from the admission of two former Vice Presidents of Flying that "exceptions" were made to allow in certain whites who did not meet minimum standards, as well as the differences between USAir's description of the Sidney Clark channel through which it maintains blacks were recruited and the testimony of Sidney Clark, who this court finds to be both neutral and credible, the court concludes that USAir's denial lacks credibility.

8. As a consequence of Captain Garland satisfying his burden of establishing a prima facie case, the burden shifted to USAir to articulate a legitimate, non-discriminatory reason for its failure to hire Captain Garland until December, 1984. *Burdine,* 101 S.Ct. at 1093. Reasons which are first articulated after initiation of the lawsuit are suspect and considered by the court to be self serving. *Healy v. New York Life Insurance Co.,* 860 F.2d 1209, 1215 (3d Cir.1988).

9. The non-discriminatory reasons which have been articulated by USAir for not hiring Captain Garland have shifted over time and must be carefully scrutinized. This court concludes that the reasons articulated by USAir lack credibility and are pretextual:

A. USAir maintains that it followed a practice, widely accepted in the airline industry, of not hiring flight officers who were currently flying for other major carriers. USAir further maintains that Captain

Garland was not offered a position when interviewed in 1982 because it did not know Captain Garland had been laid off by his former employer, Western Airlines. As previously noted, this proffered reason lacks merit and was rebutted: Captain Garland's 1981 employment application indicated that he was awaiting an "imminent furlough" from Western Airlines; USAir only interviewed those applicants it thought were employable; Plaintiff's Exhibit 7 included USAir's own written summary from Captain Garland's October, 1982 interview which identified Captain Garland's "previous employer" as Western Airlines; Captain Garland's unrebutted evidence also revealed that USAir was hiring furloughed white Western Airlines' pilots during the time his application was pending, thus establishing USAir's knowledge of Captain Garland's furlough status. Captain Garland has established that the aforementioned nondiscriminatory reason advanced by USAir for not hiring him was pretextual. *See, Bellissimo v. Westinghouse Electric Corp.,* 764 F.2d 175 (3d Cir.1985);

B. USAir also maintained that it could not hire Captain Garland between October, 1983—August, 1984 due to the Airline Deregulation Act, 49 U.S.C.App. § 1552. Under applicable regulations, the airlines had to give preference to displaced pilots who had been flying for four years prior to 1978. Captain Garland has convinced the court of the pretextual nature of this excuse for not hiring him. The evidence demonstrated, due to the dearth of black pilots with a 1974 major carrier seniority date, that those hired pursuant to LPP would be almost exclusively white males. With knowledge of the impact LPP would have on the minority composition of the workforce, USAir made exceptions so as to hire one white female and one Hispanic male. No reason was proffered by USAir as to why a similar exception was not made for Captain Garland or any other black applicant. Finally, USAir's practices under the LPP do not explain why Captain Garland was not offered employment either before October, 1983 or immediately after August, 1984 when 15 months had elapsed without the hiring of more than a single black;

C. USAir maintained at trial that Captain Garland's qualifications were weak in the area of multi-engine hours flown. When Captain Garland applied in 1981, USAir required its pilots to have a minimum of 1,200 hours total flight time with a large percentage of that being on a multi-engine or heavy aircraft. This requirement was later changed to 2,000 total hours with 1,000 hours multi-engine or heavy aircraft time. Captain Garland's 1981 application and USAir's own summary of the October, 1982 interview reveal that he had in excess of 5,000 hours total flight time with 3,000 hours multi-engine experience. Thus, Captain Garland's flight time was above that required by USAir. USAir attempted to minimize the significance of Captain Garland's flight experience at trial by characterizing the bulk of it as second officer time. Nothing in USAir's Flight Operation's Manual, which sets forth the minimum objective qualifications for pilots, indicates that second officer flight time is to be treated any differently than other flight time. USAir's distinction concerning Captain Garland's flying experience is belied by the written comment of Captain Ronald Sessa, USAir's Vice President of Flying who interviewed Captain Garland, that Captain Garland "should make [a] good employee." Captain Garland has met his burden of proving the pretextual nature of this proffered nondiscriminatory reason; and

D. Finally, USAir attempts to justify its actions on the grounds that Captain Garland did not perform satisfactorily on its psychological screening test known as the ASI. As previously noted, this court has already found that the ASI, an unvalidated psychological test ultimately abandoned by USAir without any discernable effect on the ability to evaluate applicants, was not a disqualifier for employment. It is quite possible, if USAir had interviewed and tested Captain Garland in a more timely manner, he would have performed as well on the ASI as when he was retested in early 1983. Since USAir did not offer Captain Garland employment for two years after he

completed the ASI, this court finds that USAir was not truthful in its stated reason. Pretext is therefore inferred.

10. Captain Garland has persuaded the court that he was treated less favorably than equally or less qualified whites on account of his race. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). He therefore met his ultimate burden of proving that USAir intentionally discriminated against him. *Burdine,* 101 S.Ct. at 1093. In concluding that there was intentional discrimination, the court relies upon the following matters each of which, standing alone, is sufficient to establish the requisite intent in the context of this case: USAir's operation of a distinct nepotistic/word of mouth hiring channel which benefitted whites only, *EEOC v. Metal Service Company,* 892 F.2d 341, 350 (3d Cir. 1990); *Gibson v. ILWU, Local 40,* 543 F.2d 1259 (9th Cir.1976); USAir's use of a hiring practice which gives preferential treatment to whites and has a disparate impact on black applicants (see conclusions *infra* ), *Green v. USX Corp.,* 896 F.2d 801, 807 (3d Cir.1990); USAir's failure to uniformly follow the published objective hiring criteria appearing in the Flight Operations Manual (standards were relaxed for white applicants while heightened subjective standards were used in the screening of black applicants); the EEOC determination of reasonable cause, *Smith v. American Service Company,* 611 F.Supp. 321, 329 (D.C. Ga.1984); the failure of USAir to make reasonable efforts to follow through with its stated goal of actively recruiting qualified black pilots, *see, Gonzales v. Police Department of San Jose,* 901 F.2d 758, 761 (1990); USAir's assertion that it was not receiving applications from qualified black pilots when the credible evidence shows that Captain Clark submitted between 130–140 applications on behalf of qualified black pilots; that USAir failed to hire even one black as an exception to LPP while exceptions were made for other minorities; the maintenance of a black applicant file containing approximately 10 applications when in excess of 130 such applications had been submitted by Captain Clark; as well as this court's negative assessment of USAir's credibility concerning the existence and operation of a Sidney Clark Vice President's channel for the exclusive benefit of black applicants.

11. This court also concludes that Captain Garland has met the burden of proving discrimination under a theory of disparate impact. Under this analysis, Captain Garland must identify a specific hiring practice that "has a significantly disparate impact on employment opportunities for whites and nonwhites." *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989). In the instant case, the challenged practice is USAir's operation of a separate hiring channel which is available exclusively to favored white applicants. Pursuant to *Wards Cove,* 109 S.Ct. at 2121, 2124 n. 9, this court has compared the racial composition of the "at issue jobs" (those filled through the Vice–President's channel), which is all white, to the qualified applicant pool. Given the available qualified black applicant pool as testified to by Captain Clark, this court concludes that USAir's maintenance of an all white nepotistic/word of mouth hiring channel has a disparate impact on blacks. *See, NAACP v. Town of Harrison,* 749 F.Supp. 1327, 1337 (D.N.J.1990).

12. By way of a defense to a disparate impact claim, USAir is entitled to offer evidence of a business justification for the challenged practice. USAir has offered no evidence to justify operation of a Vice–President's channel which only benefits white nepotistic/influential word of mouth applicants. Given USAir's testimony that it had fallen short on its minority recruitment goal and was therefore interested in hiring all qualified black applicants, the court can find no legitimate justification for the maintenance of employment practices such as the Vice President's channel, nepotistic/word of mouth channel, application entries which would reveal the existence of relatives and interview summary entries concerning referrals, each of which have resulted in the hire of whites only. The court further finds that USAir's "set

aside" for nepotistic applicants of one space in every other hiring class had the effect of perpetuating discriminatory practices and displacing qualified black applicants, such as Captain Garland and those referred by Captain Clark.

13. Rather than offering evidence as to the business justification for its practices, USAir attempted to show that its percentage of black pilots exceeded that which would have been indicated if the appropriate labor market were defined by census statistics. The use of statistics based upon census data by USAir is dubious where, as here, there was an identified qualified pool of actual black applicants. Even if accurate, the court rejects the use of USAir's bottom line statistics to rebut Captain Garland's case because such statistics are irrelevant to the determination of whether an individual was discriminated against or whether the particular challenged practice has a disparate impact on Captain Garland or blacks as a group. *Wards Cove*, 109 S.Ct. at 2123 n. 8; *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982).

14. The evidence also established that Captain Garland was subjected to racial harassment and retaliation which was sufficiently severe to alter his employment conditions "and create an abusive work environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). Captain Garland has shown that he was subjected to a pattern of mistreatment by co-employees after filing his charge against USAir with the EEOC. This mistreatment, which took the form of being denied cockpit jump seat privileges, public ridicule and professional ostracism, impaired Captain Garland's ability to perform scheduled work and caused other harm to him. The court is persuaded that the complained of treatment was directly linked to Captain Garland's race and his pursuit of legal remedies and that the harm suffered by him would also have been suffered by other similarly situated reasonable people. The court is further persuaded that USAir refused to take adequate steps to remedy the hostile work environment and guarantee Captain Garland the rights and privileges to which he was entitled by virtue of his employment. Conditions did not improve until after Captain Garland sought preliminary injunctive relief. The court thus concludes that Captain Garland met his burden of proving harassment and retaliation. *See Andrews v. Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990).

15. The court concludes that Captain Garland was subjected to prohibited employment discrimination as early as 1981. Since Captain Garland's application remained active, the discrimination amounted to a continuing violation which did not cease until Captain Garland's employment in December, 1984. The court also concludes that Captain Garland had no notice of this continuing violation until shortly before filing an EEOC charge in November, 1984. The court is constrained, however, from awarding relief under Title VII which goes back more than two years from the date of filing of a charge of discrimination with the EEOC. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The court therefore finds that Captain Garland is entitled to full back wages, benefits and seniority rights retroactive to November 13, 1982, *International Brotherhood of Teamsters v. Teamsters v. U.S.*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Pursuant to his § 1981 claim, Captain Garland is entitled to compensatory damages for the pain and suffering occasioned by USAir's deprivation of his right "to make and enforce contracts ... [on the same basis] as is enjoyed by white citizens." Captain Garland is also entitled to a declaratory judgment with respect to the discrimination to which he has been subjected. Injunctive relief, enjoining USAir from pursuing its discriminatory hiring practices which include an all white Vice President's channel and an all white nepotistic/word of mouth channel, shall also be issued.

16. At the reconvened hearing, this court shall hear evidence and argument so as to make specific determinations on the amount of damages to be awarded, includ-

ing back wages as of November 13, 1982 and compensatory damages under 42 U.S.C. § 1981, the form of declaratory and injunctive relief to enter and whether other relief would be appropriate to award in this case.