Natalie **JOHNSTON** and Kathy **Starke**

v.

**CITY OF PHILADELPHIA.**

Civ. A. No. 93–CV–5082.

United States District Court,
E.D. Pennsylvania.

Sept. 15, 1994.

Julie Ann Eidman, Kashkashian & Associates, Bristol, PA, for plaintiffs.

E. Jane Hix, Asst. City Sol., City of Philadelphia, Law Dept., Philadelphia, PA, for defendant.

*MEMORANDUM AND ORDER*

JOYNER, District Judge.

■ This is an action filed by Plaintiffs, Natalie Johnston and Kathy Starke, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e (1981), by the City of Philadelphia (the City). Title VII makes it an unfair employment practice for an employer to discriminate against people on the basis of their gender. *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 645, 109 S.Ct. 2115, 2118–19, 104 L.Ed.2d 733 (1989). Plaintiffs allege that the City's Police Department excludes women from employment in violation of Title VII and seek equitable and legal relief. Presently before this Court is Defendant's Motion for Summary Judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.

*STANDARD*

■ In considering a motion for summary judgment, the court must consider whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-moving party. *Id.* at 256, 106 S.Ct. at 2514. Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)).

Pleadings have closed in this action. Defendant now moves for summary judgment alleging that there exist no genuine issues of material fact regarding Plaintiffs' claims.

*FACTS*

Taking the facts alleged by Plaintiffs as true, several times a year the City's Police Department offers a written examination for

a position as a Police Officer Recruit. The test takers, or applicants, are ranked on an Eligibility List according to their score on the examination.[1] Eligibility Lists are valid for at least one, but not more than two years. Once a candidate has passed the written examination, the candidate must successfully pass through six stages of processing before being sent to the Acceptance Committee for consideration for hiring as a Police Officer Recruit.

When a training class for Police Officer Recruits is formed, applicants who have completed processing are hired in rank order from the Eligibility Lists that are in service at the time. Because more than one Eligibility List may be valid at a time, applicants are permitted and encouraged to take all the tests offered until they are hired for a recruit class.

For several years, including the year at issue here, the normal practice of choosing names from the Eligibility Lists in rank order has been affected by four Consent Orders entered into by the City and various plaintiffs. The first Consent Order required that 12 of each 100 hires over 2442 hires would be African American applicants. *Commonwealth v. O'Neill,* 100 F.R.D. 354 (E.D.Pa.1983), *aff'd,* 746 F.2d 1465 (3d Cir. 1984). The second Consent Order required that African American applicants be hired in proportion to the number of African American test takers. *Freeman v. City of Philadelphia,* 751 F.Supp. 509 (E.D.Pa.1990), *aff'd,* 947 F.2d 935 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992). The third Consent Order required that people who would have been hired from earlier, expired Eligibility Lists, but for failing an element of a vision test, would be hired. *Kimble v. Hayes,* 89–2644, 1990 WL 20208 (E.D.Pa. Dec. 15, 1992). The fourth Consent Order required that people who would have been hired from earlier, expired Eligibility Lists, but for failing a discriminatory psychiatric examination, would be hired. *Himmons v. City of Philadelphia,* 93–CV–2282 (E.D.Pa. May 11, 1994).

The result of the four Consent Orders is that candidates are not always taken from the various Eligibility Lists in strict numerical order. On occasion, people with higher rank numbers (and therefore lower test scores) are chosen for processing in order to comply with the Consent Orders, and some people are chosen from expired Eligibility Lists to comply with a Consent Order. Nonetheless, when the Police Department goes out of order to comply with a Consent Order, it selects the next complying candidate on the list. Therefore, although some candidates with low rank numbers are not hired, those that are hired are still chosen in numerical order.

Plaintiffs each took the June 23, 1990 written examination, which gave rise to the 90B Eligibility List. Johnston was ranked 411 and Starke was ranked 433 on the 90B Eligibility List. Johnston began and successfully completed processing from the 90B list. However, before she was actually approved for hiring, the 90B list expired, and she was not hired as a Police Officer Recruit. Starke also began processing from the 90B list. However, a polygraph test (fourth of the six stages of processing) revealed "deception indicated" to certain drug-related questions. Although Starke had the right to re-take the polygraph test, Police Department policy is not to reschedule the test unless it appears certain that the candidate's rank number will be reached, because the test results are only valid for six months. Because Starke's rank number was never reached, she was never rescheduled for a polygraph test and therefore, never completed processing.

## DISCUSSION

■ Plaintiffs' Amended Complaint charges that the City discriminates against women in violation of Title VII. This claim is based on a disparate impact theory. *See* Memorandum of Law Supporting Plaintiffs' Response to Defendant's Motion for Summary Judgment (Plaintiffs' Brief) at 8.[2]

---

1. Veterans, pursuant to state and federal law, have an extra ten points added to their test score.

2. Plaintiffs' argument in their Brief largely addresses discrimination against white women, and not women in general. Plaintiffs do not allege that they complied with the administrative re-

Plaintiffs can show a prima facie case under Title VII, and survive this motion for summary judgment, if they show that there is (1) a specific employment practice of the City that (2) creates a disparate impact, shown by statistical evidence. *Wards Cove*, 490 U.S. at 657, 109 S.Ct. at 2125; *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 993–95, 108 S.Ct. 2777, 2788–89, 101 L.Ed.2d 827 (1988). The statistical evidence must be "of a kind and degree sufficient to show that the practice in question has caused" the disparate impact. *Id.* at 994, 108 S.Ct. at 2788–89. Once the prima facie case is shown, Defendant may show legitimate business justifications for the allegedly discriminatory practices. *Wards Cove*, 490 U.S. at 658, 109 S.Ct. at 2125; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

First, Plaintiffs assert that use of the Eligibility Lists in combination with the Consent Orders is a specific employment practice. A specific employment practice can be either objective, as here, or subjective, such as vague hiring criteria. *Wards Cove*, 490 U.S. at 657, 109 S.Ct. at 2125; *Watson*, 487 U.S. at 994, 108 S.Ct. at 2788–89 (standardized tests are specific employment practices, as are informal and vague criteria for hiring and promoting employees); *Mozee v. American Commercial Marine Serv. Co.*, 940 F.2d 1036, 1042 (7th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 207, 121 L.Ed.2d 148 (1992). Defendant does not take issue with Plaintiffs' allegations that use of the Eligibility Lists and Consent Orders is a specific employment practice.

Second, Plaintiffs claim that the Consent Orders, although facially neutral, in fact discriminate against women. They assert that women are hired at substantially lower numbers than men, because they are disparately impacted by the Consent Orders and Eligibility Lists. Plaintiffs support this claim with statistics that raise a genuine issue of material fact, appropriate for a jury to resolve.

There is no strict rule for what amount of statistical deviation shows a disparate impact. The Supreme Court has recognized that there is no consensus as to whether a "particular number of 'standard deviations'" proves discrimination, or whether a particular mathematical standard should be used. *Watson*, 487 U.S. at 995 n. 3, 108 S.Ct. at 2789 n. 3. Instead, the Supreme Court directs lower courts to determine whether a plaintiff has shown disparities "sufficiently substantial that they raise an inference of causation." *Id.* at 995, 108 S.Ct. at 2789.

Commonly, a plaintiff will compare the composition of the employees and the composition of the relevant labor market. *Id.* at 996, 108 S.Ct. at 2790, *citing Hazelwood School Dist. v. United States*, 433 U.S. 299, 308, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977). The relevant labor market has been found to be as broad as the work force within commuting distance of the defendant, and as specific as the number of qualified applicants considered for employment by the defendant. *NAACP v. Township of West Orange*, 786 F.Supp. 408, 432 (D.N.J.1992); *Garland v. USAir, Inc.*, 767 F.Supp. 715, 726 (W.D.Pa. 1991).

Here, Plaintiffs have provided this Court with the number of people on three [3] Eligibility Lists as well as the number of people ultimately hired from those Lists. We assume for the purpose of deciding this motion that the number of candidates is the relevant labor market, and use the Plaintiffs' numbers accordingly. *Garland*, 767 F.Supp. at 726; *Paul v. F.W. Woolworth*, 809 F.Supp. 1155, 1161 (D.Del.1992) (when plaintiff pro-

quirements to bring a race challenge to the City's hiring practices, and it does not appear that they did in fact comply with those requirements, so they are now precluded from raising an argument based on race. 42 U.S.C.A. § 2000e–5(f) (1981); Memorandum of Law in Support of Defendant's Motion for Summary Judgment (Defendant's Brief) at Ex. J. Accordingly, Plaintiffs' arguments will be construed to support claims only of gender discrimination and not gender and race discrimination.

**3.** Plaintiffs also gave information on the Eligibility List from the 5/25/93 examination. Because that List is still in use, and its numbers incomplete, the Court will not consider it.

vided no evidence as to composition of employer's general work force or of broader labor pool, no prima facie case made).

The following chart reflects the Court's analysis of the numbers provided by Plaintiffs.[4]

| | |
|---|---|
| 90A Eligibility List | 11% of male applicants hired<br>14% of female applicants hired<br>= 5% more female applicants hired |
| 90B Eligibility List | 10% of male applicants hired<br>6% of female applicants hired<br>= 4% more male applicants hired |
| 91A Eligibility List | 13% of male applicants hired<br>7% of female applicants hired<br>= 6% more male applicants hired |
| Average of the Lists | 12.1% of male applicants hired<br>10.9% of female applicants hired |

■ From the above chart, it appears that women have been hired, overall, at a rate substantially equal to men. However, over the course of the three lists, during which time the Consent Orders became relevant, there was a substantial decrease in the percentage of women hired. The Court notes especially the 91A Eligibility List, where the percentage of men hired was almost double the percentage of women hired.

If one looks at the percentage overall of women to men, the numbers are even more striking. Over the course of the three lists, 631 men have been hired, whereas only 199 women have been. This produces the statistic that the Police Officer Recruit classes have been, overall, 76% men and 24% women.

The Plaintiffs lay the cause for these disparities at the door of a specific employment practice; the use of the Eligibility Lists and Consent Orders. The City has not explained the decrease in the percentage of women hired. It simply asserts that the lists are utilized in a strictly numerical fashion. The City also points out that large numbers of men are also not hired to be Police officer Recruits. Defendant's Brief at 20.

When Plaintiffs' facts are taken in the light most favorable to them however, a trend appears of a significant decrease in the percentage of women hired. This trend is not explained by Defendant and is substantial enough to raise an inference of causation. *Watson*, 487 U.S. at 994–95, 108 S.Ct. at 2788–89; *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) (causation inferred when applicants selected for hire in a "pattern significantly different from that of the pool of applicants").

■ Accordingly, there is an issue of fact whether the specific employment practice disparately impacts women. This is appropriate for a jury to decide. At trial, of course, Defendant may rebut Plaintiffs' statistical evidence with statistics of its own, by impeaching Plaintiffs' evidence, or by other traditional means. *Watson*, 487 U.S. at 996–97, 108 S.Ct. at 2790, *citing Dothard v. Rawlinson*, 433 U.S. 321, 331, 97 S.Ct. 2720, 2727–28, 53 L.Ed.2d 786 (1977).

Plaintiffs have met the standard to overcome a motion for summary judgment and have shown a prima facie case of disparate impact discrimination under Title VII. For

4. The numbers actually provided by Plaintiffs are as follows:

| | Passed Test | Hired Individuals |
|---|---|---|
| 90A Eligibility List | | |
| Total | 3,487 | 437 |
| Total Women | 929 | 136 |
| 90B Eligibility List | | |
| Total | 1,280 | 126 |
| Total Women | 287 | 18 |
| 91A Eligibility List | | |
| Total | 2,232 | 267 |
| Total Women | 595 | 45 |

According to Plaintiff, these numbers are taken from the Cover Sheets of the three lists. Plaintiffs' Brief at nn. 1–2, 5. The Court notes that these numbers could also have been gleaned from a series of memoranda Defendant attached to its Brief. Defendant's Brief at Ex. D.

these reasons, Defendant's Motion for Summary Judgment is denied.[5]

---

5. According to the City, Plaintiffs are also collaterally attacking the *Freeman* Consent Order as being improperly administered. Defendant's Brief at 21. Plaintiffs' Amended Complaint does not raise this issue. However, Plaintiffs do assert, as rebuttal to the City's defense of legitimate business reasons for its conduct, that the Consent Order was administered improperly. In addition, Plaintiffs filed a motion with Judge Broderick to hold the City in contempt of *Freeman*. This Motion was denied on July 21, 1994. Because Plaintiff has not directly raised the question of the administration of *Freeman* before this Court, we will not rule on it.